Amber Nicole LOMPE,
Plaintiff–Appellee,

v.

SUNRIDGE PARTNERS, LLC; Apartment Management Consultants, LLC, Defendants–Appellants.

Chamber of Commerce of the United States of America; American Tort Reform Association; National Federation of Independent Business; National Association of Manufacturers, Amici Curiae.

No. 14–8082.

United States Court of Appeals, Tenth Circuit.

April 1, 2016.

Amy F. Sorenson, Snell & Wilmer, LLP, Salt Lake City, UT (Amber M. Mettler and Douglas P. Farr, Snell & Wilmer, LLP, Salt Lake City, UT, and Patrick J.

Murphy, William, Porter, Day & Neville, P.C., Casper, WY, with her on the briefs), for Defendants–Appellants.

Tyson E. Logan, The Spence Law Firm, LLC, Jackson, WY (G. Bryan Ulmer, The Spence Law Firm, LLC, Jackson, WY, and Jonathan S. Massey, Massey & Gail, LLP, Washington, D.C., with him on the brief), for Plaintiff–Appellee.

Kate Comerford Todd and Warren Postman, United States Chamber Litigation Center, Washington, D.C., and Evan M. Tager and Carl J. Summers, Mayer Brown LLP, Washington, D.C., filed an Amicus brief on behalf of The Chamber of Commerce of the United States of America.

Troy L. Booher and Noella A. Sudbury, Zimmerman Jones Booher LLC, Salt Lake City, UT, filed an Amici brief on behalf of the American Tort Reform Association, National Federation of Independent Business, and National Association of Manufacturers.

Before BACHARACH, EBEL, and McHUGH, Circuit Judges.

## I. INTRODUCTION

McHUGH, Circuit Judge.

This appeal challenges the jury's award of punitive damages in a personal injury action. Amber Lompe was exposed to high levels of carbon monoxide (CO) from a malfunctioning furnace in her apartment at the Sunridge Apartments in Casper, Wyoming. Ms. Lompe brought a diversity action in the Federal District Court for the District of Wyoming against Sunridge Partners LLC (Sunridge) and Apartment Management Consultants, L.L.C. (AMC), the owner and the property manager, respectively, of the Sunridge Apartments. The jury found both Defendants liable for negligence and awarded Ms. Lompe compensatory damages totaling $3,000,000 and punitive damages totaling $25,500,000, of which the jury apportioned $3,000,000 against Sunridge and $22,500,000 against AMC.

On appeal, Defendants argue the district court erred in failing to grant their motion for judgment as a matter of law (JMOL) as to punitive damages. Alternatively, they contend the district court's jury instructions on punitive damages were erroneous and the amount of punitive damages awarded against each Defendant was excessive under common law and constitutional standards. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we hold the evidence was insufficient to submit the question of punitive damages to the jury as to Sunridge and the amount of punitive damages awarded against AMC is grossly excessive and arbitrary in violation of the Due Process Clause of the Fourteenth Amendment. Accordingly, we vacate the award of punitive damages against Sunridge and reduce the punitive damages awarded against AMC from $22,500,000 to $1,950,000.

## II. JURISDICTION

■ Before addressing the merits of the issues on appeal, we pause to consider our subject-matter jurisdiction. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006) (holding that federal courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party"). In her Complaint, Ms. Lompe alleged she is a citizen of Wyoming and Defendants are each limited liability companies (LLCs) with principal offices in Utah. In their responsive pleadings, neither Defendant identified the citizenship of each of the members of the respective LLCs. Nevertheless, the district court asserted jurisdiction based on the diversity of citizenship. *See* 28 U.S.C. § 1332.

■ But federal courts must treat LLCs as partnerships for purposes of es-

tablishing jurisdiction. *Americold Realty Trust v. Conagra Foods, Inc.,* — U.S. ——, 136 S.Ct. 1012, 1015, 194 L.Ed.2d 71 (2016) (affirming the Tenth Circuit's holding that "the citizenship of any 'non-corporate artificial entity' is determined by considering all of the entity's 'members'"); *Siloam Springs Hotel, L.L.C. v. Century Sur. Co.,* 781 F.3d 1233, 1237–38 (10th Cir.2015) ("Supreme Court precedent makes clear that in determining the citizenship of an unincorporated association for purposes of diversity, federal courts must include all the entities' members."). Accordingly, to ensure we have jurisdiction over this matter, we requested more information about the citizenship of each of the members of the LLCs. *United States v. Battles,* 745 F.3d 436, 447 (10th Cir.2014) ("It is axiomatic that we are obliged to independently inquire into the propriety of our jurisdiction."). The parties stipulated to supplemental jurisdictional facts showing the members of Sunridge are each citizens of California and the members of AMC are all citizens of Utah. Based on that information, we conclude the district court properly exercised jurisdiction over this matter under 28 U.S.C. § 1332, and we have jurisdiction over this appeal under 28 U.S.C. § 1291.

## III. BACKGROUND

Ms. Lompe was a twenty-year-old student at Casper College when she moved into the Sunridge Apartments in September 2010. On February 1, 2011, Ms. Lompe was evacuated from her apartment unit and taken to the hospital after a gas company employee detected high levels of CO emanating from her apartment. Ms. Lompe was treated for acute CO poisoning and as a result of this incident has suffered from various neurological conditions including cognitive deficits, chronic headache, sleep disturbance, and emotional dis-

orders. She has been prescribed a variety of antiseizure, migraine, mood stabilizing, and sleep stabilizing medications. Based on her injuries, Ms. Lompe filed this action against Sunridge and AMC, alleging they violated their duty of care as property owner and manager of the Sunridge Apartments. After the district court denied Defendants' motion for summary judgment, the case proceeded to trial.

### A. The Trial

 Our review requires a detailed examination of the trial record because Defendants challenge the district court's decisions denying JMOL on punitive damages and affirming the constitutionality of the punitive damages awarded against each Defendant. *See Deters v. Equifax Credit Info. Servs.,* 202 F.3d 1262, 1268 (10th Cir.2000) (explaining we review a district court's denial of a motion for JMOL de novo, "applying the same legal standard as the district court"). Defendants are "entitled to judgment as a matter of law only if all of the evidence, viewed in the light most favorable to the nonmoving party, reveals no legally sufficient evidentiary basis to find for the nonmoving party." *Jones v. United Parcel Serv., Inc.,* 674 F.3d 1187, 1195 (10th Cir. 2012) (internal quotation marks omitted). Separately, we must conduct an "exacting" de novo review of the constitutionality of the punitive damages award. *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). We therefore begin with a review of the relevant evidence presented to the jury.

#### 1. Sunridge's Ownership of the Apartments, Relationship with AMC, and Lack of Involvement in Management

In 2007, Mr. Bob Ctvrtlik[1] and his brother Jeff formed Sunridge Partners,

---

1. Mr. Bob Ctvrtlik testified on behalf of Sunridge at trial.

LLC to purchase the Sunridge Apartments, an apartment complex in Casper, Wyoming, consisting of ninety-six units. The Ctvrtliks, who reside in Southern California, had seven years of real estate investment experience at the time they purchased the apartments. They considered themselves "passive real estate investors," meaning that they would purchase properties and then hire another company to manage and maintain them.

Before purchasing the Sunridge Apartments, Sunridge obtained a "Property Condition Report" from LandAmerica, which was intended to "observe and document readily visible materials and building system defects which might significantly affect the value of the property, and determine if conditions exist which may have a significant impact on the continued operation of the facility." The report provided a general assessment of the apartment complex, ranking the condition of various components as excellent, good, fair, or poor, including the forced air heating system.

Constructed in 1979, most of the apartments were still heated by the original furnaces when Sunridge purchased the complex in 2007, though some had been replaced. The LandAmerica report identified the heating portion of the complex's broader HVAC system as "forced air gas fired furnaces" and ranked the complex's HVAC system as "fair," meaning that although it was in average or satisfactory condition, "some short term and/or immediate attention is required or recommended, primarily due to the normal aging and wear of the building system, to return the system to a good condition." Although the report did not identify replacing the furnaces as an immediate concern, it recommended the property owner set aside a capital reserve of $153,600 to replace the furnaces on a rolling basis over the course of the next five years.

Sunridge hired AMC as property manager to run the day-to-day operations of the apartments based on Sunridge's previous favorable experience using AMC to manage other properties. The management agreement between Sunridge and AMC required AMC to seek prior written approval from Sunridge before making any purchase over $1,000, except in the case of an emergency. The agreement further provided that if AMC made an emergency expenditure, it must report that purchase to Sunridge within twenty-four hours. AMC was also required to provide a monthly accounting to Sunridge detailing by category the apartment complex's monthly income and expenses. AMC received a fee of 3.4% of the complex's monthly gross income as compensation for its services. The fee was not affected by expenses.

Sunridge relied exclusively on AMC to determine what repairs and other capital expenditures should be made at the Sunridge Apartments. Contrary to the management agreement's provision that AMC must notify Sunridge of large or emergency purchases, the evidence at trial indicated that AMC provided only monthly financial statements that described expenses in general categories. Likewise, there is no direct evidence that AMC notified Sunridge of any CO-related incidents or furnace repairs. And Bob Ctvrtlik testified that AMC did not communicate this information to Sunridge.

## 2. AMC's Day-to-Day Management Role and Maintenance of the Furnaces

The trial evidence showed that AMC had exclusive knowledge about the day-to-day management of the apartment complex and the maintenance or condition of the furnaces.

### a. Training, maintenance, and CO detectors

Mr. Few, AMC's property manager at the apartment complex, lived on the same floor as Ms. Lompe. He testified AMC provided him with no safety or HVAC training after hiring him. Similarly, neither Scott Kemberling, the apartment complex's maintenance employee at the time of Ms. Lompe's CO incident, nor anyone else who worked at the Sunridge Apartments, received any training on furnace maintenance, even though Mr. Kemberling had requested such training. AMC did nothing to inspect, clean, or maintain the furnaces to ensure their safety. During semiannual, move-in, and move-out inspections of each apartment, AMC replaced furnace filters but did nothing further to inspect the furnaces for functionality or safety. And Candice Capitelli, AMC's regional property manager since May 2010, conceded on cross-examination that she had not been fully aware of all the issues she should have known about "in terms of the furnaces at Sunridge Apartments" before Ms. Lompe's CO poisoning.

Stephanie Brooks, AMC's regional property manager until May 2010, testified that in her experience, it was more common to repair furnaces as they presented problems than to institute a preventive maintenance program. Although a professional HVAC contractor did not periodically inspect all the furnaces, AMC's semiannual inspection of each apartment and furnace included "clean[ing] them, chang[ing] the furnace filters, and just identify[ing] if there are any type of issues."

An inspection conducted just after Ms. Lompe's CO incident revealed that only about half of the Sunridge Apartment units had working CO detectors. But a semiannual inspection report of Ms. Lompe's apartment conducted two years before she lived there indicated "[r]eplaced

Batt on $CO_2$ [sic]." Moreover, several invoices from 2010 evidenced AMC's purchase of CO detectors. And Mr. Few said he replaced CO detectors in the units any time they were discovered missing.

Valerie Lynne Mesenbrink, a manager at the apartments in 2007 who was promoted to a senior manager position in 2008, testified about continual problems with the complex's furnaces since 2007. She said AMC had not done any safety maintenance or inspections on the furnaces between 2007 and Ms. Lompe's CO poisoning in 2011. Instead AMC's policy was to have a CO detector in each apartment and to test and "go over" it with each tenant upon move-in. Ms. Mesenbrink also indicated that AMC amended the tenants' lease agreements in 2009 to include a fine for removing or unplugging CO detectors.

John Haid, the owner of Haid's Plumbing & Heating in Casper, Wyoming, provided maintenance and repair services at Sunridge Apartments for about twenty years. AMC periodically requested bids from Mr. Haid for a preventive safety inspection on all the furnaces. Mr. Haid provided only oral bids, and AMC never accepted one. Mr. Haid told AMC employees they should regularly inspect and maintain furnaces, particularly as they age. Mr. Haid occasionally repaired furnaces that SourceGas, the local gas company, had red-tagged to indicate the furnace was dangerous and could not be operated until repaired or replaced. AMC called him when a tenant at Sunridge Apartments smelled gas or an apartment had no heat, but Mr. Haid was never called to do any safety inspections.

According to Mr. Haid, AMC's approach to furnace maintenance was consistent with other apartments or buildings he serviced. Even though Mr. Haid did not believe it was safe to operate furnaces until they fail or break down without in-

specting them, he conceded that many other property managers also take this approach. Indeed, Mr. Haid testified that few apartment complexes have adopted a preventative maintenance program.

### b. Previous incidents and furnace problems

At trial, Ms. Lompe elicited testimony about four CO incidents at the Sunridge Apartments—her own and three others. The first incident occurred on January 23, 2009, when Mr. Haid serviced a furnace that had been red-tagged by the gas company "possibly for a [CO] tester going off or something or they smelled gas." He cleaned the heat exchanger, replaced the gas valve, pilot assembly, and setup.

The second incident happened in October 2009, when Mr. Few was exposed to CO while in the complex's clubhouse and was treated at the hospital for CO poisoning. The clubhouse did not have a CO detector because no one slept there. After the incident involving Mr. Few, Ms. Mesenbrink suggested to her employer, AMC, that it should maintain the furnaces better or replace them, but nothing was done. The regional manager, Ms. Brooks, testified she was not aware of any changes to AMC's furnace inspection policies after Mr. Few's CO exposure. Mr. Ctvrtlik testified that AMC never informed Sunridge of Mr. Few's CO exposure or that, following this incident, AMC had replaced the clubhouse furnace at a cost of over $2,600.

On January 6, 2010, the third CO incident resulted in the evacuation of an apartment, but no injuries were reported. At oral argument before this court, counsel for Defendants argued this incident did not involve the Sunridge Apartments, relying on a service order produced by Source-Gas. The service order, which is part of the record, was referred to as Exhibit 9 at trial but not admitted into evidence. The first page of the exhibit is a screen shot of

a CO leak report dated January 6, 2010, showing an address that does not match that of the Sunridge Apartments. The second page of this exhibit, however, lists the correct address for the Sunridge Apartments and contains comments about a service call on that date, stating "emergency carbon monoxide leak ... dispatched to Cathy Imus C/O detector was going off at 200 parts per million apt complex evacuated renters." Whatever question there may be about the conflicting address information contained in Exhibit 9, it was not brought to the attention of the jury. And Mr. Few testified about a CO leak in January of 2010 that required the evacuation of a unit at the Sunridge Apartments. Accordingly, we consider the January 2010 event as one of those forming the basis of AMC's knowledge regarding the state of the furnaces prior to the incident involving Ms. Lompe. But Ms. Lompe did not provide evidence that Sunridge was informed of any of the three CO incidents that occurred prior to her own CO exposure.

The evidence at trial also included expert testimony regarding the significance of these CO incidents. Over Defendants' objection, Ms. Lompe offered the expert testimony of Michael Slifka, a fire protection engineer and an expert in the area of property management. Mr. Slifka explained that the complex's furnaces greatly exceeded their twenty-year useful life under industry standards, because they were over thirty years old at the time of Ms. Lompe's CO exposure. He also testified that the Sunridge furnaces had been "poorly maintained" and that neither Sunridge nor AMC was meeting its obligations under industry standards to maintain a safe heating system. Mr. Slifka further opined that Defendants had received three forms of notice indicating the furnaces were not safe: (1) the LandAmerica assessment, (2) their knowledge of a

number of furnace events starting in 2009 that involved CO leaks, gas valve failures, or venting problems, and (3) at least three separate CO leaks in the five months prior to Ms. Lompe's CO incident. Based on these indications of the furnaces' diminishing condition, Mr. Slifka testified that Defendants should have behaved more proactively, rather than simply repairing furnaces on an as-needed basis. According to Mr. Slifka, not doing so put the tenants at risk of harm.

Defendants' expert, an astrogeophysicist named Dr. Romig, testified that because so many variables are involved in a furnace leak, he could not state that an inspection within the previous six months could have prevented the incident involving Ms. Lompe. But upon cross-examination, Dr. Romig conceded that the maintenance issues and previous CO incidents at the apartments "should have prompted a decision to look into getting new furnaces."

### c. Ms. Lompe's poisoning

Mr. Few testified that he arrived at the complex's office at about 7:30 a.m. on February 1, 2011. At about 9:30 a.m. he went to Ms. Lompe's floor to deliver a lease renewal to another tenant. Outside Ms. Lompe's apartment, Mr. Few detected an odor reminiscent of the smell he encountered during his CO exposure in 2009. He called SourceGas, which dispatched a technician to the Sunridge Apartments. The technician, Mr. Mike Coryell, detected high levels of CO on Ms. Lompe's floor. Mr. Few and Mr. Coryell removed Ms. Lompe from her apartment and then immediately called 911 and evacuated the area. Shortly after ventilating Ms. Lompe's apartment, Mr. Few sent Mr. Kemberling to look for a CO detector in the unit. Mr. Kemberling testified that he found an unplugged CO detector in the apartment unit at that time. Following Ms. Lompe's incident, Mr. Kemberling inspected each unit to verify whether it had

a functioning CO detector, finding that many units did not.

Mr. Coryell testified that he responded to the emergency dispatch order at the complex on February 1, 2011. Mr. Coryell's CO detector sounded an alarm immediately as he entered the building, indicating a CO level of at least twenty-five parts per million. When he reached Ms. Lompe's floor, a second level alarm sounded, indicating at least fifty parts per million. Mr. Coryell explained that this is the level at which an evacuation should take place, which he implemented, beginning with Ms. Lompe. Mr. Coryell testified that Ms. Lompe, "from a sitting position right at the door, reached up and opened the door and then slumped back down.... She was not able to stand up. She ... crawled out into the hallway." Upon opening Ms. Lompe's door, Mr. Coryell's meter began reading 500 parts CO per million. He then told Mr. Few to call 911, and Ms. Lompe was taken to the hospital.

After ventilating Ms. Lompe's apartment, Mr. Coryell red tagged her furnace and, after inspecting the other furnaces on Ms. Lompe's floor, also red tagged her neighbor's furnace because it too was emitting CO. He testified that he did not remember seeing any CO detectors on Ms. Lompe's floor, including in Ms. Lompe's or her neighbor's apartments. Mr. Coryell also testified that furnaces should have some maintenance work or an inspection conducted at least every other year. On cross-examination, however, Mr. Coryell reiterated that in his post-incident inspection of all the furnaces on Ms. Lompe's floor, he red tagged only two of them. And he stated that he had seen furnaces on other occasions that were "dirty and starting to accumulate, but they were not plugged. They were not putting out carbon monoxide. They were not a danger."

Mr. Haid testified that AMC hired him to repair or replace the furnaces that had

been red tagged by SourceGas in Ms. Lompe's and her neighbor's apartments. Mr. Haid had to replace Ms. Lompe's furnace but was able to repair her neighbor's. When he replaced Ms. Lompe's furnace, Mr. Haid saw a CO detector in her apartment.

Ms. Lompe also testified. She stated that no one explained any safety features when she moved into Sunridge and although she found what she believed to be a CO detector in her unit, it did not appear to work properly even after she replaced the battery. Assuming the CO detector was broken, and believing it had belonged to the prior tenant (because CO detector was not listed on the move-in sheet), Ms. Lompe had thrown it away.

### 3. Renewed Motion for JMOL

After the close of evidence, Defendants moved for JMOL. As to punitive damages, Defendants argued that Ms. Lompe had not presented evidence sufficient to show that either Defendant had acted willfully and wantonly, with a conscious disregard for the safety of the tenants and knowing or having reason to know with a high degree of probability that the conduct would result in harm, as required by Wyoming law. The district court denied Defendants' motion and allowed the question of punitive damages to go to the jury as to both Defendants, recognizing, however, that punitive damages are a "disfavored form of relief" in Wyoming and that the evidence in this case was "weak ... because it is a failure to act rather than an act done in a negligent way"; that is, "it is an act that smacks highly of inattention on the part of the defendants in this case as well as ignorance."

### 4. Jury Instructions

Defendants proposed two instructions on punitive damages. Proposed instruction 11 stated "Willful and wanton misconduct has been defined as: that which tends to take on the aspect of highly unreasonable conduct, or an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." Defendants' proposed instruction 12 provided the following further guidance: "The aggravating factor which distinguishes willful misconduct from ordinary negligence is the actor's state of mind. In order to prove that an actor has engaged in willful misconduct, one must demonstrate that he acted with a state of mind that approaches intent to do harm." These proposed instructions incorporated language from *Danculovich v. Brown*, 593 P.2d 187, 191 (Wyo.1979) and *Cramer v. Powder River Coal, LLC*, 204 P.3d 974, 979 (Wyo.2009), respectively. But the district court refused both instructions, providing instead Jury Instruction No. 42, modeled on the Wyoming Civil Pattern Jury Instructions:

Punitive damages are allowable, in a proper case, to punish the defendant and to deter the defendant and others similarly situated from engaging in similar conduct in the future.

If you find that plaintiff Amber Lompe is entitled to recover compensatory damages as a result of either defendant's conduct, you may in your sole judgment and discretion award additional punitive damages against that defendant if, and only if, you find by a preponderance of the evidence that that defendant was guilty of willful and wanton misconduct....

Willful and wanton misconduct is the intentional doing of an act, or an intentional failure to do an act, in reckless disregard of the consequences, and under such circumstances and conditions that a reasonable person would know, or have reason to know, that such conduct would, with a high degree of probability, result in harm to another.

In response to the jury's request during deliberations for a definition of "wanton,"

the district court referred the jury back to Instruction 42 and additionally provided the jury with a definition of "wanton" that was identical to Defendants' proposed instruction 11, quoted above.

### 5. Jury Verdict

The jury found by a preponderance of the evidence that AMC, Sunridge, and Ms. Lompe had each been negligent in the circumstances resulting in her injury, apportioning the fault 65% to AMC, 25% to Sunridge, and 10% to Ms. Lompe. Thus, the jury's verdict reduced the $3,000,000 compensatory damages award by 10% to $2,700,000 to reflect Ms. Lompe's share of fault for her injury. This award included amounts for economic loss, loss of enjoyment of life, disability, and $950,000 for "[p]ain, suffering, and emotional distress (past and future)." AMC's portion of the compensatory damages award was $1,950,000, and Sunridge was responsible for $750,000. The jury also found by a preponderance of the evidence that punitive damages should be awarded against both Sunridge and AMC, necessitating a second phase of the trial for the jury to decide the amount of punitive damages.

### B. Punitive Damages Phase

In the punitive damages phase of the trial, Ms. Lompe called Dr. Paul Randle as an expert witness on Defendants' financial condition. Dr. Randle testified as to the income and profitability of Sunridge and AMC. As to AMC, Dr. Randle summarized its income, expenses, and members' share of income from 2007 through 2012 using gross and net income figures from the members' tax returns. Dr. Randle explained that nearly all of AMC's net in-

come was distributed to its owners, with a total distribution between 2005 and 2012 of $22,860,142. Factoring executive salaries into this amount, Dr. Randle opined the total partner income for those years was over $24 million.[2]

After closing arguments, the jury deliberated and returned a punitive damages award of $25,500,000, assessing $3,000,000 against Sunridge and $22,500,000 against AMC.

### C. Denial of Post–Verdict Motion for JMOL

After the close of trial, Defendants renewed their motion for JMOL or, in the alternative, for a new trial or remittitur, challenging the sufficiency of the evidence for the jury's verdict of liability, compensatory damages, and entitlement to punitive damages, as well as the jury instructions on punitive damages and the amount of punitive damages. The district court denied Defendants' motion in its entirety. *Lompe v. Sunridge Partners, LLC,* 54 F.Supp.3d 1252, 1270–71 (D.Wyo.2014) (concluding Ms. Lompe presented sufficient evidence of willful and wanton misconduct to send the question of punitive damages to the jury, the jury was properly instructed on the standard for punitive damages under Wyoming law, and the punitive damages award was "within the realm of punitive damages that does not cross the constitutional line"). As to the punitive damages challenge, the district court concluded the ratio of punitive damages to compensatory damages was "9–to–1 (considering the total punitive damages award for both defendants collectively)." *Id.* at 1270.[3] Moreover, the district court

---

2. These figures showed AMC's income for its operations in all states, not just Wyoming. The district court overruled Defendants' objection to including all of AMC's income instead of only Wyoming income.

3. That is, the court compared the full amount of punitive damages awarded collectively ($25,500,000) against the entire compensatory damages award ($3,000,000), without reducing the latter to reflect Ms. Lompe's own share of the fault (10%, or $300,000).

explained the ratio as to Sunridge individually was 1:1 ($3,000,000 to $3,000,000) and 7.5:1 as to AMC individually ($22,500,000 to $3,000,000). *Id.*

The district court acknowledged, however, "that the award of punitive damages is significant and far greater than that usually seen in this district," stating that "[i]n all probability, the Court likely has not made such a large award for punitive damages." *Id.* at 1271. The district court nevertheless denied defendants' request for a remittitur or new trial, concluding that "[w]hile surprising, the award does not shock the judicial conscience nor is the Court compelled to conclude that the jury's award should be upset, based on the facts and circumstances of the defendants' conduct and the harm to the plaintiff and potential harm to others." *Id.*

## IV. DISCUSSION

In this appeal, Defendants argue the district court erred in (A) denying their motion for JMOL as to punitive damages because the evidence was insufficient to show willful and wanton misconduct and because Ms. Lompe had failed to prove Defendants' net worth,[4] (B) improperly instructing the jury on Wyoming's standard for punitive damages, (C) denying their motion for a remittitur or new trial because the punitive damages award was excessive under Wyoming common law standards, and (D) awarding punitive damages that are grossly excessive and arbitrary under the Fourteenth Amendment. We address each argument in turn.

### A. Motion for JMOL on Submitting Punitive Damages to the Jury

■ We review the district court's denial of JMOL de novo. *Jones v. United Parcel Serv., Inc.*, 674 F.3d 1187, 1200 (10th Cir.2012). But we will reverse the district court "only if all of the evidence, viewed in the light most favorable to the nonmoving party, reveals no legally sufficient evidentiary basis to find for the nonmoving party." *Id.* (internal quotation marks omitted). "[W]e will not weigh the evidence, judge witness credibility, or challenge the factual conclusions of the jury" and "we may not substitute our judgment for that of the jury." *Rocky Mountain Christian Church v. Bd. of Cty. Comm'rs,* 613 F.3d 1229, 1235–36 (10th Cir.2010) (internal quotation marks omitted). When applying this standard in diversity cases, "the substantive law of the forum state governs the analysis of the underlying claims, including specification of the applicable standards of proof, but federal law controls the ultimate, procedural question whether judgment as a matter of law is appropriate." *Jones,* 674 F.3d at 1195 (internal alteration and quotation marks omitted). This is a deferential standard because, even though the district court makes a de novo determination about the sufficiency of the evidence, it must defer to the jury's determinations as the fact finder.

Defendants argue (1) the evidence was insufficient to show either party engaged in willful and wanton misconduct, and (2) Ms. Lompe failed to prove Defendants' net

---

4. Defendants moved for leave to supplement the record on appeal to include additional financial documents and trial documents regarding their response to discovery requests. Ms. Lompe opposed and moved to strike references in Defendants' Reply brief citing to their proposed Supplemental Appendix. We deny the motion to supplement and the request to strike as moot because in reversing as to Sunridge and significantly reducing AMC's punitive damages, we have not considered any materials in the proposed Supplemental Appendix or any information or argument from the Reply brief relying on such materials or information. Accordingly, the proposed supplemental material is irrelevant and its absence does not prejudice Defendants.

worth as required by Wyoming law. We reverse as to Sunridge and affirm as to AMC.

### 1. Willful and Wanton Misconduct under Wyoming Law

Under Wyoming law, punitive damages are disfavored "and are to be allowed with caution within narrow limits." *Weaver v. Mitchell*, 715 P.2d 1361, 1369 (Wyo.1986). Punitive damages are only appropriate for "circumstances involving outrageous conduct, such as intentional torts, torts involving malice and torts involving willful and wanton misconduct." *Cramer v. Powder River Coal, LLC*, 204 P.3d 974, 979 (Wyo.2009) (internal quotation marks omitted). The Wyoming Supreme Court defines willful and wanton misconduct as· "the intentional doing, or failing to do, an act in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know that such conduct would, in a high degree of probability, result in harm to·another." *Id.* "The aggravating factor which distinguishes willful misconduct from ordinary negligence is the actor's state of mind." *Id.* (internal quotation marks omitted). A willful or wanton state of mind is one "that approaches intent to do harm." *Id.* (internal quotation marks omitted). We apply this punitive damages standard in determining whether the trial evidence sufficiently showed that each Defendant's actions constituted the willful and wanton misconduct required to submit the question of punitive damages to the jury as a matter of law.

### a. Insufficient evidence of willful and wanton misconduct as to Sunridge

Our review of· the record convinces us that, "viewed in the light most favorable to" Ms. Lompe, "the evidence and all reasonable inferences to be drawn from it point but one way"—that they do not show willful and wanton misconduct by Sunridge. *See Rocky Mountain Christian Church,* 613 F.3d at 1235. The trial evidence establishes Sunridge purchased the property for investment purposes and hired a reputable property manager to take care of the day-to-day management of the apartments. Sunridge owner Mr. Ctvrtlik believed, based on his prior favorable experience, that he could rely on AMC to ensure safe conditions at Sunridge. Whether Wyoming law allows such a delegation of a duty from a passive real estate investor-owner to a residential property management company is not relevant to the question of whether Sunridge exhibited willful and wanton misconduct for purposes of assessing punitive damages.[5] Instead, the propriety of delegating such a

---

5. Wyoming law is unclear concerning whether such an assignment of duties is permissible. Indeed, the parties disputed at trial the meaning of section 1–21–1202(d) of the Wyoming Residential Rental Property Code, which states "[a]ny duty or obligation in this article·may be assigned to a different party or modified by explicit written agreement signed by the parties." Wyo. Stat. Ann. § 1–21–1202(d). Defendants argued this allowed Sunridge to assign all of its duties as a property owner to AMC, whereas Ms. Lompe argued Sunridge could only do so if expressly agreed to by the tenants themselves. The district court ruled that "[t]he statute applies to assignments between landlords and tenants. It does not govern any assignment between landlords and property managers." *Lompe v. Sunridge Partners, LLC,* 54 F.Supp.3d 1252, 1260 (D.Wyo.2014) (citing Arthur R. Gaudio, *Wyoming's Residential Rental Property Act—A Critical Review,* 35 Land & Water L.Rev. 455, 478 (2000)). Even assuming the district court's reading is a correct prediction of how the Wyoming Supreme Court will interpret the statute, a good faith misinterpretation of the meaning of section 1202(d) does not demonstrate willful and wanton misconduct.

duty relates to a negligence analysis, which is not before us.[6]

Furthermore, Mr. Ctvrtlik testified that he had no knowledge of Mr. Few's CO poisoning in 2009 and that Sunridge, as opposed to AMC, had received no complaints about the furnaces. The only evidence Ms. Lompe could present to show Sunridge had any knowledge about the condition of the furnaces—or any potential danger resulting from the age of the furnaces—was the LandAmerica report, which had recommended somewhat generically that reserves be set aside to replace the furnaces on a rolling basis over a five-year period. Noticeably absent from the LandAmerica report is any warning that the furnaces posed a potential danger to tenants. And the evidence at trial indicated that the policy employed at the Sunridge Apartments of replacing furnaces as they failed was not an "extreme departure from ordinary care." *Danculovich v. Brown*, 593 P.2d 187, 191 (Wyo.1979).

At oral argument before this court, Ms. Lompe's counsel identified as the best evidence of Sunridge's willful and wanton misconduct meriting punitive damages under Wyoming law an inference that Sunridge must have known about Mr. Few's CO poisoning because of certain provisions in Sunridge's contract with AMC. Specifically, counsel argues Sunridge must have been aware of Mr. Few's CO poisoning because the management agreement requires AMC to seek approval from Sunridge for any expense exceeding $1,000 or to notify Sunridge within twenty-four hours of any emergency expenses. And the evidence shows that replacing the clubhouse furnace after Mr. Few's incident cost over $2,600.

But the unimpeached evidence establishes that Sunridge relied entirely on AMC to manage the apartment complex. Mr. Ctvrtlik testified that Sunridge received only the monthly financial reports from AMC, which listed expenses and income in general categories. And, while language in the management agreement may have required AMC to provide notice for large expenses, Ms. Lompe presented no evidence showing AMC, in fact, notified Sunridge of expenses related to, or that Sunridge had actual knowledge of, Mr. Few's CO incident or any other CO leaks prior to Ms. Lompe's exposure.[7] Similarly, even if AMC regional managers should have forwarded maintenance bids on the furnaces to Sunridge for approval, Ms. Lompe fails to cite any evidence showing Sunridge actually received such bids. In fact, the evidence elicited at trial shows to the contrary. But even accepting that Sunridge was provided with the bids to replace certain furnaces, it had no reason to assume AMC would not respond appropriately to whatever circumstances had created the need to do so.[8] Sunridge re-

---

6. The jury found Sunridge had indeed breached its duty of care as owner of the property to Ms. Lompe as a tenant and that this breach of duty proximately caused her injury. In turn, the compensatory damages award is the jury's determination of the amount that will make Ms. Lompe whole for Sunridge's breach of its duty of care. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419, 123 S.Ct. 1513 (2003) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575, 116 S.Ct. 1589 (1996)); *accord Sinclair Oil Corp. v. Columbia Cas. Co.*, 682 P.2d 975, 978 (Wyo.1984) ("Punitive damages are not allowed to compensate plaintiffs nor are they designed to be a wind-

fall."). Defendants did not appeal the liability determination or the amount of compensatory damages.

7. Although the dissent is correct that Mr. Ctvrtlik expected to be told if a tenant had to be evacuated due to a carbon monoxide leak, he further testified that, in fact, he was not told.

8. Nor are we convinced that testimony about what Sunridge may have learned after Ms. Lompe's exposure is relevant to whether it engaged in willful and wanton misconduct prior to that event.

lied on AMC to manage the property competently and had prior experience suggesting that such trust was warranted.

Thus, even if the evidence of Sunridge's minimal involvement in the operation of the apartments could support a finding of negligence, it is insufficient as a matter of law to establish the willful and wanton misconduct necessary to support an award of punitive damages in Wyoming. *See Weaver,* 715 P.2d at 1370 ("Punitive damages are not appropriate in circumstances involving inattention, inadvertence, thoughtlessness, mistake, or even gross negligence." (citing *Danculovich,* 593 P.2d at 191)). Accordingly, we reverse the district court's denial of JMOL as to Sunridge because the trial evidence was insufficient to send the question of punitive damages to the jury.

*b. Punitive damages were appropriately submitted to the jury as to AMC*

■ Defendants also contend the evidence was insufficient to show AMC's actions constituted willful and wanton misconduct. They argue that AMC relied on the services of trained professionals such as Mr. Haid and always repaired or replaced furnaces when problems arose. Defendants also emphasize AMC's policy of providing a CO detector in each apartment unit even though not required to do so by Wyoming law. And they insist AMC did not fail to do anything that any tenants requested after Mr. Few's CO incident.

Viewing the evidence in the light most favorable to Ms. Lompe, we conclude a reasonable jury could find AMC engaged in willful and wanton misconduct warrant-

ing punitive damages under Wyoming law. Specifically, AMC was on notice of the dangerous condition of the complex's fleet of furnaces well before Ms. Lompe's CO incident. AMC knew the furnaces were nearly thirty years old despite having a useful life of about twenty years, and AMC failed to act on bids for regular safety inspections of the furnaces despite three CO leaks at the Sunridge Apartments prior to Ms. Lompe's injury. On this record, a reasonable jury could find that AMC intentionally failed to act "in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know that such [inaction] would, in a high degree of probability, result in harm to another." *See Cramer,* 204 P.3d at 979. Specifically, the age of the furnaces, the prior failures, and the proven risk of the escape of dangerous levels of CO made it almost certain that a repair-as-needed maintenance program, in this instance, would result in serious injury to one or more tenants. Accordingly, we affirm the district court's denial of JMOL on punitive damages as to AMC.

**2. Evidence of Net Worth Required by Wyoming Law**

■ We also reject AMC's argument that the district court should have granted JMOL because Ms. Lompe did not provide sufficient evidence of AMC's "net worth."[9] AMC focuses its argument on one line from *Rosty v. Skaj,* in which the Wyoming Supreme Court reversed a punitive damages award because plaintiff "presented no evidence of [the defendant's] assets or net worth." 272 P.3d 947, 959 (Wyo.2012).

---

9. Ms. Lompe contends Defendants waived this argument. We disagree. In their motion for JMOL, Defendants argued Ms. Lompe's presentation of their financial condition was misleading and therefore punitive damages were improper. Although the district court did not expressly rule on this issue, we are

satisfied that Defendants adequately presented it to the district court. *See Covey v. Assessor of Ohio Cty.,* 777 F.3d 186, 195 (4th Cir. 2015) (reviewing an issue the district court did not rule on because "the argument was raised below and is therefore properly before the Court.").

AMC argues that because Ms. Lompe failed to provide evidence of its net worth at the time of trial, we should likewise reverse the punitive damages award here. We decline to read *Rosty* as requiring plaintiffs in all contexts to present evidence of a defendant's *net worth* at the time of trial to fulfil Wyoming's rule that "in the absence of evidence of a defendant's wealth or financial condition an award of punitive damages cannot be sustained." *Id.* (quoting *Adel v. Parkhurst,* 681 P.2d 886, 892 (Wyo.1984)); *see also Campen v. Stone,* 635 P.2d 1121, 1129–31 (Wyo.1981) (explaining the "New York approach" of bifurcating trials where punitive damages are at issue "makes good sense" because "evidence of a defendant's wealth, when coupled with evidence of his culpability, provides a realistic guide for the assessment of damages that will, in fact, punish the defendant. Thus, utilization of evidence of wealth is consistent with the punishment and deterrence objectives of punitive damages." (internal quotation marks and citation omitted)).

Defendants "do not argue that net worth is the *only* appropriate evidence" of wealth or financial condition. Nevertheless, they misinterpret *Rosty* as requiring evidence specifically of net worth at the time of trial as a predicate to seeking punitive damages in this case. *Rosty* did not establish such a rigid rule.[10] First, the defendant in *Rosty* was an individual, and therefore evidence of his net worth and assets was likely the only reasonable measure of his wealth. Second, the only evidence offered to establish the financial condition of the defendant in *Rosty* was a single, and not particularly current, pay stub. *Rosty,* 272 P.3d at 959. In contrast, to demonstrate the financial condition of a business entity like AMC, Ms. Lompe could reasonably rely on a variety of financial measures, including profits and losses, net income, and owner distributions. Ms. Lompe chose to present AMC's gross and net income and partner distributions for the eight years prior to trial as "evidence of a defendant's wealth or financial condition" as a predicate for punitive damages. *See id.*

To the extent AMC believed this evidence was not representative of its real economic condition, it could have presented rebuttal evidence. *See Sears v. Summit, Inc.,* 616 P.2d 765, 772 (Wyo.1980), *modified on other grounds by Adel v. Parkhurst,* 681 P.2d 886 (Wyo.1984) ("Not only may the plaintiff introduce evidence as to the wealth of the defendant, but the defendant may also introduce evidence of impecunity in order to mitigate the award of punitive damages."). But AMC failed to do so. Under these circumstances, we decline to hold Ms. Lompe's evidence of AMC's wealth or financial condition insufficient for purposes of submitting the question of punitive damages to the jury.[11]

---

**10.** In fact, *Rosty* noted that the plaintiff had presented no evidence of the defendant's net worth *or of financial condition at the time the judgment was entered* and explained that the Wyoming Supreme Court had "not addressed the issue" of whether evidence of wealth or financial condition must be as of the time of judgment, acknowledging, however, that "other jurisdictions have held that a defendant's wealth is appropriately measured 'at the time of entry of the judgment, in recognition that that is the time that the wrongdoer must feel the sting of an appropriately sized punitive damage penalty.'" *Rosty v. Skaj,* 272 P.3d 947, 959 & n. 2 (Wyo.2012) (quoting *Tarr v. Bob Ciasulli's Mack Auto Mall, Inc.,* 194 N.J. 212, 943 A.2d 866, 871 (2008)). But this contemplation in *dicta* related to the timeframe of the evidence of wealth or financial condition and not to what the specific measure should be.

**11.** The Wyoming Supreme Court has also explained that although the ultimate purpose of punitive damages is punishment and deterrence, "[t]he punitive allowance should be in an amount that would promote the public interest without financially annihilating the defendants. Wrongdoers may be punished

### B. Jury Instructions on Punitive Damages

AMC argues that even if the district court properly sent the question of punitive damages to the jury, its punitive damages instruction misstated Wyoming law. We review a district court's decision to give a particular instruction for an abuse of discretion, but we review the "legal sufficiency of an instruction" de novo. *EEOC v. Beverage Distribs. Co.*, 780 F.3d 1018, 1020 n. 1 (10th Cir.2015).

Rejecting AMC's two proposed jury instructions on punitive damages, the district court instructed the jurors that they could award punitive damages "if, and only if, you find by a preponderance of the evidence that that defendant was guilty of willful and wanton misconduct." Modeled on Wyoming Civil Pattern Jury Instruction 4.06, the district court's Jury Instruction No. 42 also defined "willful and wanton misconduct" as follows:

> Willful and wanton misconduct is the intentional doing of an act, or an intentional failure to do an act, in reckless disregard of the consequences, and under such circumstances and conditions that a reasonable person would know, or have reason to know, that such conduct would, with a high degree of probability, result in harm to another.

*See also Cramer v. Powder River Coal, LLC,* 204 P.3d 974, 979 (Wyo.2009). And

in response to the jury's request for a definition of "wanton," the district court instructed the jury using language identical to AMC's proposed instruction 11, which included the following language from *Danculovich v. Brown,* 593 P.2d 187, 191 (Wyo.1979): "Willful and wanton misconduct has been defined as: that which tends to take on the aspect of highly unreasonable conduct, or an extreme departure from ordinary care, in a situation where a high degree of danger is apparent."

Although the district court gave these two instructions on punitive damages, AMC now argues, based on *Farmers Insurance Exchange v. Shirley,* 958 P.2d 1040 (Wyo.1998), that the district court erred in declining to offer Defendants' proposed instruction 12 to further define "willful misconduct" [12] in response to the jury's request for a definition of "wanton." In *Shirley,* the plaintiff sued an insurance company for breach of the duty of good faith and fair dealing. *Id.* at 1042. The district court gave a jury instruction on punitive damages that virtually mirrors Instruction No. 42 here. *Id.* at 1051. Although the Wyoming Supreme Court in *Shirley* determined this instruction was an accurate statement of Wyoming law, it held that in the context of a claim of insurer bad faith, the jury needed to be further instructed that "[p]roof of a bad

---

without being destroyed." *Town of Jackson v. Shaw,* 569 P.2d 1246, 1253 (Wyo.1977). However, *Shaw* did not hold that if a jury awards punitive damages that will financially ruin the defendant, the district court should grant JMOL on the punitive damages issue. Instead, *Shaw* held that the excessive award in that case should be reduced.

12. Proposed instruction 12 states: "The aggravating factor which distinguishes willful misconduct from ordinary negligence is the actor's state of mind. In order to prove that an actor has engaged in willful misconduct, one must demonstrate that he acted with a

state of mind that approaches intent to do harm." *Cramer v. Powder River Coal, LLC,* 204 P.3d 974, 979 (Wyo.2009) (internal quotation marks omitted). But the district court rejected Defendants' proposed instruction 12, and thus the jury was not instructed on this particular "intent to do harm" language from *Cramer.* The district court referred to *Danculovich* to explain its rejection of the instruction, stating "[w]illful and wanton misconduct requires intent rather than inadvertence, not an intent to cause an injury but to do the act without regard to consequences, reckless." Jury Instruction No. 42 conveyed this principle to the jury.

faith cause of action does not necessarily make punitive damages appropriate." *Id.* (brackets and internal quotation marks omitted). Specifically, the *Shirley* Court held the jury should be instructed that "[f]or punitive damages to be awarded in addition to compensatory damages for the tort [breach of the duty of good faith], there must be a showing of an evil intent deserving of punishment or something in the nature of special ill-will or wanton disregard of duty or gross or outrageous conduct. For punitive damages to be awarded, a defendant must not only intentionally have breached his duty of good faith, but in addition must have been guilty of oppression, fraud or malice." *Id.* (internal quotation marks omitted).

Even if *Shirley* is not limited to claims for breach of the duty of good faith, as Ms. Lompe argues, the context here does not raise the same concerns. The intent element of negligence, the underlying tort claim here, is more easily distinguished from the intent required for the willful and wanton misconduct needed to support punitive damages than the intent element at issue in *Shirley*. Where jury confusion was not likely, there was no requirement that the district court provide further instruction. And although the district court did not give AMC's proposed instruction 12, explaining that the state of mind required for punitive damages must approach an intent to harm,[13] it provided the jury with instructions defining willful and wanton misconduct in language from other Wyoming Supreme Court decisions and

modeled after the Wyoming Civil Pattern Jury Instructions. This was not error.

We accordingly hold that under the circumstances here, the jury instructions as given were an accurate statement of Wyoming law on punitive damages.

### C. Waiver of the Common Law Excessiveness Challenge

■ AMC also argues it is entitled to a new trial or remittitur of the amount of punitive damages because the award was so excessive that it shocks the judicial conscience under Wyoming law. We agree with Ms. Lompe that AMC has waived this argument by failing to present it properly in the district court. In its post-verdict renewed motion for JMOL, new trial, or remittitur, AMC correctly cited the legal standard governing a motion for new trial or remittitur on grounds that a damages award is so excessive that it shocks the judicial conscience. (Defs.' Mot. JMOL 10) Rather than pressing this particular common-law excessiveness objection in its argument, however, AMC instead focused exclusively on its objection to the constitutionality of the punitive damages award under the Fourteenth Amendment's Due Process Clause. But differing standards of review govern each claim. *Hardeman v. City of Albuquerque,* 377 F.3d 1106, 1122 (10th Cir.2004) ("Unlike constitutional challenges, we review the district court's disposition of a motion for remittitur or new trial based on a common law excessiveness claim for abuse of discretion.").

---

13. Nevertheless, the dissent "assumes" the jury found AMC acted with "intent to do harm" or "evil intent" based on language from *Cramer.* Dissent at 1079–80; 1081–82. In particular, the dissent explains that "[b]ecause the jury found willful and wanton misconduct, the jury must have regarded AMC's misconduct as 'something in the nature of special ill-will' that constituted 'oppression,

fraud, or malice.'" *Id.* at 1082 (quoting *Farmers Ins. Exch. v. Shirley,* 958 P.2d 1040, 1051 (Wyo.1998)). But the district court did not instruct the jury using language from *Shirley,* and we here reject AMC's argument that a new trial should be granted based on the failure to include the *Cramer/Shirley* "special ill-will" or "evil intent" language in the jury instructions.

We abide by the established principle that "issues adverted to in a perfunctory manner, unaccompanied by some ·effort at developed argumentation, are deemed waived." *Id.* (internal quotation marks omitted) (addressing excessiveness of punitive damages in the opposite situation where common law excessiveness was argued to the exclusion of unconstitutionality). AMC also contends, however, that the· district court's discussion of whether the punitive damages award was excessive sufficiently preserves the issue ·for appeal. The district court indeed included language derived from the common law excessiveness standard in its discussion ·of the constitutional due process analysis. *Lompe v. Sunridge · Partners, ·LLC,* 54 F.Supp.3d 1252, 1267–71. But in addressing AMC's motion for JMOL, new trial, or remittitur as to the punitive damages phase· of the trial, the district court mixed the analyses of whether a damages award (compensatory or punitive) is overly excessive under the common law and whether an award of punitive damages specifically is grossly excessive and arbitrary under the due process constitutional analysis. Because the district court's analysis purported to resolve the constitutional due process analysis (even though it couched its ultimate .findings in language relevant to the common-law excessiveness analysis), the district court's opinion does not preserve the common law excessiveness claim. We therefore decline to consider it further.

### · D. Constitutional Due Process Clause Analysis

We now consider Defendants' argument that the district court erred in finding the amount of the punitive damages award against AMC constitutional under the Due Process Clause of the Fourteenth Amendment. We first discuss the "exacting de novo" review the Supreme Court has mandated in reviewing constitutional challenges to punitive damages awards. We then apply that standard using the Supreme Court's guidepost analysis ·in *BMW of· North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct; 1589,· 134 L.Ed.2d ·809 (1996). Finally, we ·conclude that the punitive damages award against AMC is grossly excessive and arbitrary in violation of constitutional ·due process, and we reduce it accordingly. ·

### 1. .Exacting De Novo Review

Due process · requires· federal courts to perform an ·"exacting" de novo review of the constitutionality of punitive damages awards to ensure "that an award of punitive damages is based upon an 'application of law, rather than a decisionmaker's ·caprice.'" *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 418, 123 S.Ct. 1513. (2003) (quoting *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.,* 532 U.S. 424, 436, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) ("[C]ourts of appeals should apply a *de novo* .standard . of review when passing· on district courts' determinations of the constitutionality of punitive damages awards.")). This· standard differs from the deferential de novo review that · a court applies when ruling on a motion for JMOL, new trial, or remittitur.

Although "it is the duty of the trial judge to require a remittitur or a new trial" if "the amount of damages awarded is excessive," *Linn v. United Plant Guard Workers,* 383 U.S. 53, 65–66, 86 S.Ct. 657, 15 L.Ed.2d 582· (1966), the Seventh Amendment constrains the, trial court to defer to the fact-finding function of ,the jury, *Cooper Indus.,* 532 U.S. at 437 n. 11, 121. S.Ct. 1678. This fact-finding function encompasses questions of liability .and the amount of compensatory. damages. Under this deferential standard, when "a new tri-al motion asserts that the jury .verdict is not supported by the evidence, the verdict must stand unless it is clearly, decidedly,

or overwhelmingly against the weight of the evidence." *Anaeme v. Diagnostek, Inc.,* 164 F.3d 1275, 1284 (10th Cir.1999) (internal quotations omitted). As with the JMOL standard, the trial court must view the evidence in the light most favorable to the prevailing party. *Id.*

■ The Supreme Court has explained, however, that "[u]nlike the measure of actual damages suffered, which presents a question of historical or predictive fact, the level of punitive damages is not really a 'fact' 'tried' by the jury." *Cooper Indus.,* 532 U.S. at 437, 121 S.Ct. 1678 (quoting *Gasperini v. Ctr. for Humanities, Inc.,* 518 U.S. 415, 459, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996) (Scalia, J., dissenting) (other internal citation omitted)). "Because the jury's award of *punitive damages* does not constitute a finding of 'fact,' appellate review of the district court's determination that an award is consistent with due process does not implicate ... Seventh Amendment concerns." *Id.* (emphasis added). Although "[a] jury's assessment of the extent of a plaintiff's injury is essentially a factual determination," the jury's "imposition of punitive damages is an expression of its moral condemnation." *Id.* at 432, 121 S.Ct. 1678 (citing *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 350, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) ("[Punitive damages] are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence." (alteration as in *Cooper Industries* ))). Moreover, "[a]s the types of compensatory damages available to plaintiffs have broadened, the theory behind punitive damages has shifted toward a more purely punitive (*and therefore less factual* ) understanding." *Id.* at 437 n. 11, 121 S.Ct. 1678 (emphasis added, internal citation omitted). Thus, we need not remand for Ms. Lompe "to choose between a new jury trial or acceptance of [a] remittitur" if a reduction in the amount of punitive damages is "required by the Constitution" rather than merely "a court's determination as to whether substantial evidence at trial supported the amount awarded." *Jones v. United Parcel Serv.,* 674 F.3d 1187, 1208 n. 8 (10th Cir. 2012).

■ In ruling on Defendants' constitutional challenge in this case, the district court improperly applied a deferential standard of review, explaining that it "hesitates to interfere with the jury's determination as to [the amount of] punitive damages" because "it is not the Court's province to second-guess the jury's findings." *Lompe,* 54 F.Supp.3d at 1271. This might have been a valid conclusion under the deferential JMOL standard or the new trial or remittitur standards for reviewing the jury's determination as to liability, compensatory damages, and even for analyzing whether a punitive damages award is overly excessive under the common law. But it is not a correct description of the district court's responsibility in reviewing the constitutionality of a punitive damages award under the Due Process Clause. Because the Supreme Court has directed lower federal courts to apply an "exacting" de novo standard of review when considering the constitutionality of a punitive damages award, the district court erred by deferring to the jury's punitive damages award. We therefore separately analyze the constitutionality of the punitive damages award under the exacting de novo standard mandated by the Supreme Court.

### 2. Constitutional Due Process Analysis of the Punitive Damages Award

■ The Supreme Court has instructed that "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will

subject him to punishment, but also of the severity of the penalty that a State may impose." *Gore,* 517 U.S. at 574, 116 S.Ct. 1589. Consequently, "the Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *Jones,* 674 F.3d at 1206 (alteration and internal quotation marks omitted). In reviewing a constitutional challenge to an award of punitive damages under the Due Process Clause of the Fourteenth Amendment, a federal court must "consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm,* 538 U.S. at 418, 123 S.Ct. 1513 (citing *Gore,* 517 U.S. at 575, 116 S.Ct. 1589). And courts of appeal must apply a de novo standard of review when entertaining a challenge to the district court's application of these factors and its determination of the constitutionality of a punitive damages award. *Cooper Indus.,* 532 U.S. at 436, 121 S.Ct. 1678; *see also State Farm,* 538 U.S. at 418, 123 S.Ct. 1513.

■ Although our review of the district court's due process analysis is de novo, we defer to the jury's and the district court's factual findings unless they are clearly erroneous. *See Cooper Indus.,* 532 U.S. at 440 n. 14, 121 S.Ct. 1678 ("While we have

determined that the Court of Appeals must review the District Court's application of the *Gore* test *de novo,* it of course remains true that the Court of Appeals should defer to the District Court's findings of fact unless they are clearly erroneous.").[14] But a predicate to any obligation to defer is the existence of findings of fact made by the jury or the district court. Here, the jury was not asked to answer special interrogatories. Thus, it rendered only two pronouncements with respect to punitive damages: (1) that AMC's conduct warranted an award of punitive damages under Wyoming law; and (2) the amount of punitive damages awarded against AMC should be $22.5 million. Indeed, the district court acknowledged its inability to ascertain anything more about the jury's view of the evidence based on this record.

> The jury's synthesis of all the testimony, evidence and exhibits received during the trial is not something readily capable of review. What weight they attributed to a witness's testimony, how they assessed credibility of witnesses, and their consideration of exhibits admitted is not something the Court or the parties can divine on the record of these proceedings.

*Lompe,* 54 F.Supp.3d at 1267. *See also Cooper Indus.,* 532 U.S. at 449 n. 2, 121 S.Ct. 1678 (Ginsburg, J, dissenting) (criticizing the majority's adoption of a de novo review standard for reviewing the due process limits of punitive damages awards and noting that although the de novo standard includes deference to factual findings un-

---

**14.** The Supreme Court noted the limited role of this deference in the context of the constitutional review of a punitive damage award, stating

[o]nly with respect to the first *Gore* inquiry do the district courts have a somewhat superior vantage over courts of appeals, and even then the advantage exists primarily with respect to issues turning on witness credibility and demeanor. Trial courts and

appellate courts seem equally capable of analyzing the second factor. And the third *Gore* criterion, which calls for a broad legal comparison, seems more suited to the expertise of appellate courts.

*Cooper Indus.,* 532 U.S. at 440, 121 S.Ct. 1678 (addressing the relative institutional competence of district and appellate courts with respect to assessing the constitutionality of punitive damages awards).

less clearly erroneous, "[a]n appellate court might be at a loss to accord such deference to jury findings of fact absent trial court employment of either a special verdict or a general verdict accompanied by written interrogatories").

With respect to the jury's first verdict, we have already held that the evidence presented at trial is sufficient to support the jury's finding that AMC's conduct met the Wyoming threshold for an award of punitive damages.[15] But the jury's verdict in the liability phase of trial does not inform our constitutional analysis further. And the verdict after the second phase of trial setting the amount of the punitive damages is neither a factual finding nor entitled to deference. *See Cooper Indus.*, 532 U.S. at 437, 121 S.Ct. 1678. Consequently, the jury here made no findings that are relevant to our application of the *Gore* factors.[16]

There is a similar dearth of factual findings by the district court. This is in large measure because the district court improperly applied a deferential standard of review to AMC's due process challenge.[17] *See Lompe*, 54 F.Supp.3d at 1270–71 (citing the *Gore* factors but applying a common law "passion and prejudice" standard, under which "[a] court's authority to grant remittitur should be exercised with extreme reluctance."). In its discussion of the constitutionality of the punitive damages award, the district court appears to make four findings: (1) the harm to Ms. Lompe was physical, not merely economic; (2) if exposed longer, Ms. Lompe could have been disabled for life or killed; (3) the potential for similar injuries to others was great where AMC failed to correct known problems with furnaces, exposing other tenants to the risk of carbon monoxide poisoning; and (4) "[t]his was not an isolated incident."[18] *Id.* at 1271. After

---

**15.** We agree with the dissent that the jury's finding that AMC's conduct was willful and wanton—thereby supporting an award of punitive damages—includes an implicit finding that AMC's conduct was reprehensible. Dissent at 1081–82. But we separately assess the degree of AMC's reprehensibility in reviewing the constitutionality of the jury's punitive damages award.

**16.** The dissent suggests that either the district court or this panel can infer that the jury considered AMC's behavior particularly outrageous, egregious, or reprehensible based on the size of the punitive damages awarded. We respectfully disagree. To do so would confuse the deference afforded under common law with the strict de novo review applicable to a due process challenge. Indeed, it is difficult to imagine a situation in which the punitive damages award could be held unconstitutional if the size of the award itself is treated as a "finding" on reprehensibility to which deference is owed.

**17.** The district court includes in its analysis a recitation of facts the jury could have found based on the evidence presented. *Lompe v. Sunridge Partners, LLC*, 54 F.Supp.3d 1252, 1268 (D.Wyo.2014). These statements are

not findings of fact by the district court, and we do not treat them as such.

**18.** The dissent is correct that we have not concluded the district court's findings are clearly erroneous, and that "[t]hese four findings reflect reprehensible conduct by AMC." Dissent at 1082. But the dissent relies on other facts the district court allegedly "found," referring to facts the jury could have found or to evidence offered. For example, the dissent indicates "the district court stated that after the apartment manager was poisoned, the local gas utility had told AMC that the furnaces should be inspected." Dissent at 1084. But the portion of the district court's opinion cited by the dissent is a discussion of evidentiary objections. Indeed, the district court concludes the testimony on this point was not hearsay because it was not offered for the truth of the matter asserted. *Lompe*, 54 F.Supp.3d at 1257. Even assuming, however, that this could be a finding by the district court, it is not inconsistent with our assessment that AMC's failure to act was in reckless disregard of the consequences, and under such circumstances and conditions that a reasonable person would know, or have reason to know, that such conduct would, with a

briefly addressing the relevance of wealth evidence and the purpose of punitive damages, the district court then states "[t]his is the only conduct that is relevant to the reprehensibility analysis." *Id.* Thus, we accept these four findings as the district court's only findings on reprehensibility and we defer to each of them in analyzing the *Gore* guideposts under the Supreme Court's exacting *de novo* review standard.

 Ultimately, federal courts "must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *State Farm*, 538 U.S. at 426, 123 S.Ct. 1513. In our review of the constitutionality of the punitive damages award against AMC, therefore, we must primarily decide "whether [the] particular award is greater than reasonably necessary to punish and deter." *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 22, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). The Supreme Court has instructed us to go "no further" if a "more modest punishment" for the "reprehensible conduct" at issue "could have satisfied the State's legitimate objectives" of punishing and deterring future misconduct. *State Farm*, 538 U.S. at 419–20, 123 S.Ct. 1513.

### a. Reprehensibility

 We look first to the degree of reprehensibility of AMC's conduct.[19] "It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is *so reprehensible* as to warrant the imposition of *further sanctions to achieve punishment or deterrence.*" *Id.* at 419, 123 S.Ct. 1513 (emphasis added) (citing *Gore*, 517 U.S. at 575, 116 S.Ct. 1589). *Gore* held that the degree of reprehensibility was "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." 517 U.S. at 575, 116 S.Ct. 1589.

In addressing this issue, courts are to consider the following: (1) whether the harm caused was physical as opposed to economic; (2) whether the defendant acted with indifference or a reckless disregard for the health or safety of others; (3) the financial vulnerability of the plaintiff; (4) whether the defendant's wrongful conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Jones*, 674 F.3d at 1207 (citing *State Farm*, 538 U.S. at 419, 123 S.Ct. 1513).

Addressing the first factor, the district court has found the harm here was physical, and that finding is not clearly erroneous. Ms. Lompe suffered injuries consistent with CO poisoning, and the record reflects at least the possibility she will have lingering physical injuries for many years, possibly the rest of her life.[20] But

high degree of probability, result in harm to another. In other words, we agree with the dissent that AMC's conduct was reprehensible based on this willful and wanton misconduct standard. Where we and the dissent disagree is on the degree of reprehensibility under the constitutional analysis.

**19.** As the dissent notes, "[t]oday, courts routinely rank the degree of the defendant's reprehensibility on a wide spectrum that runs from very little reprehensibility, through mod-

est or intermediate reprehensibility, and up to substantial or extreme reprehensibility." Dissent at 1080 (quoting Laura J. Hines & N. William Hines, *Constitutional Constraints on Punitive Damages: Clarity, Consistency, & the Outlier Dilemma*, 66 Hastings L.J. 1257, 1303 (2015)). Our analysis takes full account of the existence of such a spectrum.

**20.** We provide more detail on the evidence concerning Ms. Lompe's injuries in footnote 29 below.

the compensatory damages award reflected both physical harm and economic loss. The jury awarded Ms. Lompe general damages in the form of compensatory damages totaling $1,450,000 for pain, suffering, and emotional distress (past and present), disability, and loss of enjoyment of life. The jury also awarded her $1,550,000 in damages for loss of future earning capacity and medical expenses (past and future) to compensate her for her economic loss.

Skipping to the third *Gore* factor, it is true that as a low income college student, Ms. Lompe was financially vulnerable. But as a practical matter, the financial vulnerability factor does not have particular relevance in this case, where the harm Ms. Lompe suffered was physical rather than a reprehensible exploitation of financial vulnerability through fraud or other financial misconduct. Here, Ms. Lompe's financial vulnerability reflects at most her unequal bargaining power in negotiating the lease or in interactions about unpaid rent or fees. However, we find such matters tangential to the constitutionality of the amount of punitive damages in this case.

We analyze the second, fourth, and fifth factors together because they relate to AMC's actions—or inaction—as the on-site management company responsible for the day-to-day business of managing the buildings and tending to regular maintenance. The district court found that AMC failed to correct known problems with the furnaces and that AMC's inaction risked exposing all of the complex's tenants to CO poisoning. Nevertheless, neither the jury nor the district court found that AMC acted with the intent to harm Ms. Lompe or any other tenants. Thus, we conclude AMC's failure to act was not the "result of intentional malice, trickery, or deceit," and was instead a "mere accident." *See State*

*Farm,* 538 U.S. at 419, 123 S.Ct. 1513. *See also Jones,* 674 F.3d at 1207.

Notwithstanding that conclusion, the evidence at trial showed that AMC's failure to act was not an isolated incident but rather resulted from AMC's "wrongful conduct involv[ing] repeated actions," or in this case, repeated failures to act. *Jones,* 674 F.3d at 1207. That is, three prior CO leaks, including one in which Mr. Few was poisoned, put AMC on notice that the furnaces needed regular substantive safety inspections to prevent future dangerous releases of CO. Failing to perform such inspections recklessly endangered not only Ms. Lompe, but also all the tenants at the apartment complex, and the risk included death. *See Philip Morris USA v. Williams,* 549 U.S. 346, 354–57, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007) (holding that punitive damages cannot be used to punish the defendant for harm to nonparties, but that the risk of harm to nonparties can be considered in assessing reprehensibility).

But we cannot ignore the evidence that distances AMC's misconduct from the "extreme reprehensibility" end of the *constitutional* reprehensibility spectrum in the due process analysis. AMC was never cited or criticized by SourceGas or other regulators in Wyoming for the condition of the furnaces or the incidents in which Mr. Few or Ms. Lompe were poisoned. Moreover, AMC provided each tenant with a CO detector even though this was not required by state law or industry custom. The evidence regarding the effectiveness of providing these monitors was mixed. Although AMC amended the lease agreements to provide sanctions for tampering with the CO monitors, an inspection immediately after Mr. Lompe was poisoned revealed that many units lacked functioning CO monitors. There was also some evidence to suggest AMC conformed to industry standards in dealing with the aging fleet of furnaces by repairing them as

problems arose. But Ms. Lompe provided expert testimony opining that annual inspections should have been performed, and further precautions should have been implemented after Mr. Few's exposure.[21]

On balance, application of the *Gore* factors does not support a conclusion that AMC's conduct was particularly reprehensible.[22] It is true that AMC engaged in a pattern of "wrongful conduct," evidenced by indifference to the prior CO leaks, the fact the furnaces were well past their useful life, and that CO exposure could cause serious injury or death to the residents of the Sunridge Apartments. But AMC's wrongful conduct consisted of a failure to act rather than any intent to injure through affirmative conduct, and thus was not "the result of intentional malice, trickery, or deceit," *Jones*, 674 F.3d at 1207 (citing *State Farm*, 538 U.S. at 419, 123 S.Ct. 1513), which the Supreme Court has identified as an indication of "particularly reprehensible conduct," *Gore*, 517 U.S. at 576, 116 S.Ct. 1589. Although AMC's failures to act are deserving of punishment beyond the compensatory award, we are not convinced that its failures to act were so particularly reprehensible that due process would allow such a severe punishment as the $22,500,000 in punitive damages awarded here.[23]

### b. Ratio between punitive damages award and compensatory damages

"The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *Gore*, 517 U.S. at 580, 116 S.Ct. 1589. But the Supreme Court's guidance on the proper ratio between punitive and compensatory damages is difficult to apply.[24] On the one hand, the Court has explained that "in practice, few awards

**21.** Our independent assessment of the evidence relevant to the *Gore* guideposts is consistent with the strict de novo review required by the Supreme Court. *See Jones*, 674 F.3d at 1207 (assessing the reprehensibility of the defendant by assessing the evidence under the *Gore* factors and reversing the district court's decision upholding the punitive damages award). Indeed the de novo consideration at the appellate level of the facts relevant to the reprehensibility of the defendant was a source of disagreement among the Court. *See Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 443, 121 S.Ct. 1678 (2001) (Scalia, J., concurring) ("I was of the view that we should review for abuse of discretion (rather than *de novo*) fact-bound constitutional issues ... but the Court held otherwise."). But even if we ignore this evidence, there is nothing in the record to suggest that AMC intended to harm Ms. Lompe or any other tenant.

**22.** We use the phrase "particularly reprehensible" because this is the nomenclature adopted by the Supreme Court in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589 (1996).

**23.** The dissent notes that "faced with this same evidence, the jury regarded AMC's misconduct as willful and wanton." Dissent at 1083. We agree and accordingly have affirmed the jury's determination that punitive damages were justified under Wyoming's willful and wanton standard. That means, as the jury was instructed, that AMC's conduct must have been "in reckless disregard of the consequences, and under such circumstances and conditions that a reasonable person would know, or have reason to know, that such conduct would, with a high degree of probability, result in harm to another."

**24.** Indeed, Justice Scalia observed that "the punitive damages jurisprudence which has sprung forth from *BMW v. Gore* is insusceptible of principled application." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 429, 123 S.Ct. 1513 (2003) (Scalia, J., dissenting). Although we have endeavored to follow the Supreme Court's guidance, we do not suggest there is any ready template for conducting the constitutional analysis required under *Gore*, as confirmed here by the dissent's well-reasoned and competing *Gore* analysis.

exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm,* 538 U.S. at 425, 123 S.Ct. 1513. And the Court has likewise found historical support for "sanctions of double, treble, or quadruple damages to deter and punish," all of which qualify as single digit ratios: 2 to 1; 3 to 1; 4 to 1. *Id.* The Court further instructs that these historical ratios "demonstrate what should be obvious," which is that "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution." *Id.* This suggests that up to a 9:1 ratio of punitive damages to compensatory damages is likely acceptable in some cases, and that a 10:1 ratio might be permissible because it does not exceed 9:1 to a significant degree.

■■■ But, on the other hand, the Supreme Court questions the propriety of single digit ratios that exceed 4:1, stating "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *Id.* (citing *Haslip,* 499 U.S. at 23–24, 111 S.Ct. 1032 (1991)). The Court further explains that even a 2:1 ratio may be unconstitutional in some circumstances: "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.* The Supreme Court has not defined "substantial" in this context and has been "reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award." *Id.* at 424, 123 S.Ct. 1513 (citing *Gore,* 517 U.S. at 582, 116 S.Ct. 1589); *see also id.* at 425, 123 S.Ct. 1513 ("[T]hese ratios are not

binding, they are instructive."). Ultimately, however, "[t]he precise award" of punitive damages "must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Id.* Against this backdrop, we now undertake our de novo review of the award against AMC.

We begin by examining the amount of compensatory damages. As discussed, the jury awarded Ms. Lompe $3,000,000 in compensatory damages, including $1,450,000 for pain, suffering, and emotional distress (past and present), disability, and loss of enjoyment of life, and $1,550,000 for loss of future earning capacity and medical expenses (past and future). This amount was reduced by 10% to account for Ms. Lompe's contributory negligence, resulting in a compensatory damages award of $2,700,000.

In reviewing the alleged unconstitutional excessiveness of the punitive award, the district court created a ratio for *each Defendant* by comparing the punitive damages award assessed against each Defendant individually ($3,000,000 against Sunridge and $22,500,000 against AMC) to the *full compensatory damages award* of $3,000,000. The district court thus calculated a 1:1 ratio for Sunridge and a 7.5:1 ratio for AMC. This calculation was incorrect because it did not, first, reduce the compensatory amount to $2,700,000 to account for Ms. Lompe's own negligence or, next, compare the proportion of the punitive damages award assessed against each Defendant with only that Defendant's individual portion of the total compensatory damages.[25] Because the Defendants were not jointly and severally liable, each would only be responsible for that portion of the compensatory damages award allocated to it.[26] Correctly

---

**25.** On its general verdict form, the jury apportioned fault for the negligence resulting in Ms. Lompe's injury 25% to Sunridge and 65% to AMC.

**26.** At least two federal circuits have ruled that calculating the punitive-to-compensatory ratio

calculated, AMC's ratio of punitive damages to compensatory damages for purposes of the constitutional review is 11.5:1 ($22,500,000 in punitive damages to $1,950,000 in compensatory damages).

In determining whether a ratio of 11.5:1 is unconstitutionally excessive in this case, we must review the substantiality of the compensatory damages award. The Supreme Court has defined different standards for punitive awards depending on whether they are combined with substantial or insubstantial compensatory damages. When compensatory damages are low but the degree of reprehensibility high, double digit ratios, such as 10:1; *might* "comport with due process." *State Farm*, 538 U.S. at 425, 123 S.Ct. 1513 (citing *Gore*, 517 U.S. at 582, 116 S.Ct. 1589). Such a situation could exist if, for example, a defendant fired a gun into a crowd but did not hit anyone. But "[w]hen compensatory damages are substantial, then a lesser ratio, *perhaps only equal to compensatory damages*, can reach the outermost limit of the due process guarantee." *Id.* (emphasis added). That is, where compensatory damages are already substantial, a ratio of 1:1 may be the most the Constitution will permit.

Because the Supreme Court has not defined "substantial" for purposes of compensatory damages, we must glean its meaning from application. In *State Farm*, for example, the Supreme Court held that a compensatory damages award of $1,000,000 for a year and a half of emotional distress was "substantial." And in cases decided since *State Farm*, compensatory damages have often been considered "substantial" when they are over $1,000,000. The Eighth Circuit recently observed that between 1996 (when the Supreme Court decided *Gore*) and 2012, the circuit had "reviewed an award of punitive damages exceeding $1 million with a ratio to compensatory damages greater than 1:1" on only three occasions. *Ondrisek v. Hoffman*, 698 F.3d 1020, 1029–30 (8th Cir. 2012). And in each of those instances, the Eighth Circuit concluded the compensatory damages were substantial and the punitive award should be reduced after a *Gore* analysis. *Id.*[27] But in many cases, compensatory damages less than $1,000,000 have also been considered substantial.[28] In *Jones*, for example, a panel of this court

by using the full compensatory award when a defendant is only liable for a portion of the damages is improper. *Clark v. Chrysler Corp.*, 436 F.3d 594, 606 n. 16 (6th Cir.2006) ("[A] ratio based on the full compensatory award would improperly punish [Defendants] for conduct that the jury determined to be the fault of the plaintiff."); *Grabinski v. Blue Springs Ford Sales, Inc.*, 203 F.3d 1024, 1026 (8th Cir.2000) ("[D]ivid[ing] each individual punitive damages award by the entire actual damages award" rather than by that portion of the compensatory damages award allocated to each Defendant, "assumes an impossibility ... because it posits that each defendant will ultimately pay the full compensatory damages award.").

27. The dissent correctly notes that in *Ondrisek v. Hoffman*, 698 F.3d 1020, 1029–30 (8th Cir. 2012), the Eighth Circuit ultimately approved a ratio of 4:1 based on its application of the *Gore* factors. *See id.* at 1029 (concluding that the defendant's conduct, which included severe beatings of minors, was extremely reprehensible where defendant had previously been found liable for the same type of conduct against other minors). We refer to *Ondrisek* as support for our conclusion that the compensatory damage award here is substantial. And that conclusion does not end our inquiry into whether the punitive damages award here is constitutional. We address the *Gore* guideposts together in Section IV(D)(2)(d) below.

28. AMC and the Chamber of Commerce, in its amicus brief, both collect a number of such decisions. Aplt. Br. 50 n. 22; Chamber Br. 19 n. 5. In response, Ms. Lompe lists cases affirming ratios of 10:1 or more. Resp. Br. 51–54. We consider some of these decisions in greater detail below. But the disparity in holdings indicates that the maximum of punitive damages that comports with due process is highly dependent upon the relevant facts.

reduced a punitive damages award of $2,000,000 to a 1:1 ratio with the "substantial" compensatory damages of $630,307. *Jones,* 674 F.3d at 1195, 1208.

Here, Ms. Lompe received compensatory damages totaling $2,700,000, of which $1,950,000 was assessed against AMC. And the compensatory damages included $950,000 for "emotional distress (past and future)," a component of compensatory damages the Supreme Court has noted may be redundant of punitive damages. *State Farm,* 538 U.S. 408, 426, 123 S.Ct. 1513 (2003) (quoting Restatement (Second) of Torts § 908, Comment c, at 466 (1977) ("In many cases in which compensatory damages include an amount for emotional distress, such as humiliation or indignation aroused by the defendant's act, there is no clear line of demarcation between punishment and compensation and a verdict for a specified amount frequently includes elements of both.")). In light of the nature of the injuries actually suffered by Ms. Lompe, the award of compensatory damages is substantial.[29] It also exceeds or is consistent with the amounts of compensatory damages that have been found to be substantial by many other courts. Therefore the 11.5:1 ratio between the punitive award against AMC and its portion of these substantial compensatory damages is constitutionally suspect. *State Farm,* 538 U.S. at 425, 123 S.Ct. 1513 (stating that

perhaps a ratio of 1:1, where compensatory damages are substantial, "can reach the outermost limit of the due process guarantee").

### c. Penalties in comparable cases

Under the third guidepost, we must evaluate "the disparity between the punitive damages award and the civil penalties authorized or imposed in comparable cases." *State Farm,* 538 U.S. at 428, 123 S.Ct. 1513 (internal quotation marks omitted).[30] "The fundamental question is whether [Defendant] had reasonable notice that [its conduct] could result in such a large punitive award." *Cont'l Trend Res., Inc. v. OXY USA Inc.,* 101 F.3d 634, 641 (10th Cir.1996).

Looking first to comparable civil penalties, we acknowledge that violations of common law tort duties often "do not lend themselves to a comparison with statutory penalties." *Id.* This comparison is particularly challenging here because Wyoming law does not regulate the inspection or replacement of furnaces, nor does it require property owners to provide CO detectors. But Wyoming law does impose some obligations on the owner of a residential building: "To protect the physical health and safety of the renter, each owner [in Wyoming] shall: . . . (iii) Maintain electrical systems, plumbing, *heating* and hot and cold water." Wyo. Stat. Ann. § 1–21–

---

**29.** Ms. Lompe was discharged from the hospital the same day she was admitted, resumed living at the Sunridge Apartments, and her own expert was equivocal about whether she was disabled as a result of the exposure. At the time of trial, Ms. Lompe was working as a *receptionist* at wages comparable to those she earned before the incident. She also continued to referee and play basketball and to sing and travel with a choir. Although Ms. Lompe's expert opined that her goal of obtaining a Ph.D. was likely foreclosed, the record included evidence that her declining academic performance pre-dated her CO-exposure.

**30.** The dissent argues this guidepost is inapplicable here because of the weakness of the available comparisons. Dissent 1088–90. Alternatively considering this guidepost for the sake of argument, the dissent assumes it supports a substantial reduction in the assessment of punitive damages, but just not to a ratio of 1:1. *Id.* at 1088. Although the lack of robust comparisons renders this guidepost less helpful in the overall analysis, we include what information is available to comport with the Supreme Court's direction and we ultimately reach a conclusion on the limits of due process different than the dissent.

1203(a) (emphasis added). If the owner fails to do so, the renter may "[u]pon a showing of an unreasonable refusal to correct or the failure to use due diligence to correct a condition . . . . be awarded costs, damages and affirmative relief," including judicial termination of the rental agreement. *Id.* § 1–21–1206(c). But the Wyoming statute further provides "[t]he owner is not liable under this article for claims for mental suffering or anguish." *Id.* § 1–21–1203(e). Accordingly, Wyoming does not provide for civil penalties that would have put AMC on notice that failure to maintain the furnaces could subject it to punitive damages of the magnitude awarded by the jury here.[31]

AMC notes that at least one state requires landlords to provide CO detectors but imposes penalties of no more than $10,000 for failure to do so. *See, e.g.,* Vt. Stat. Ann. tit. 20, §§ 2729(d), 2734(a). And we have located other state statutes that require carbon monoxide monitors in residential units and impose moderate fines or, in some cases, misdemeanor criminal liability for noncompliance.[32] Nevertheless, these statutes are not helpful to

---

**31.** In this circuit, Colorado, Kansas, New Mexico, Oklahoma, and Utah also have statutes requiring the maintenance of residential heating systems. *See* Col.Rev.Stat. Ann. § 38–12–505(1)(d) (providing that a residential property is uninhabitable if it "substantially lacks ... [f]unctioning heating facilities that conformed to applicable law at the time of installation and that are maintained in good working order"); Kan. Stat. Ann. § 58–2553(a)(3) (requiring landlord to "maintain in good and safe working order and condition all ... heating ... appliances"); N.M. Stat. Ann. § 47–8–20(A)(4) (requiring owner to "maintain in good and safe working order and condition ... heating"); Okla. Stat. Ann. tit. 41, § 118(A)(3) (providing that landlord shall "[m]aintain in good and safe working order and condition all ... heating ... facilities and appliances"); Utah Code Ann. § 57–22–4(1)(b)(ii) ("To protect the physical health and safety of the ordinary renter, an owner ... shall ... maintain ... heating").

But none of these statutes imposes civil fines or criminal liability. *See* Col.Rev.Stat. Ann. § 38–12–507 (providing that tenant can obtain injunctive relief, "actual damages," and under certain conditions may terminate the lease agreement if the landlord breaches the warranty of habitability); Kan. Stat. Ann. § 58–2559(a)–(b) (providing that tenant may terminate the lease agreement and "recover damages and obtain injunctive relief"); N.M. Stat. Ann. § 47–8–27.1(A)(1), (B) (providing that "if a reasonable attempt to remedy [a] breach is not made" after written notice "the rental agreement shall terminate as provided in the notice" and the renter "may also recover damages and obtain injunctive relief for any material noncompliance by the owner");

Okla. Stat. Ann. tit. 41, § 121(A)–(D) (providing that tenant may, upon notice and failure of the landlord to remedy, terminate the rental agreement or "[r]ecover damages based upon the diminution of the fair rental value of the dwelling unit"); Utah Code Ann. § 57–22–6(2), (5)(c)(ii) (providing that upon written notice of defect and failure to correct, renter may terminate the rental agreement and recover damages in court). And Utah, like Wyoming, excludes the recovery of damages for pain and suffering. *See* Utah Code Ann. § 57–22–6(6) ("An owner may not be held liable under this chapter for a claim for mental suffering or anguish."). *See also* Col.Rev. Stat. Ann. § 38–12–507(b) (limiting tenant to "actual damages" for breach of warranty of habitability).

**32.** *See, e.g.,* Cal. Health & Safety Code § 17926(c)(1) (imposing "a maximum fine of two hundred dollars ($200) for each offense"); 430 Ill. Comp. Stat. Ann. 135/15(a) ("willful failure to install or maintain in operating condition any [CO] alarm ... is a Class B misdemeanor"); 730 Ill. Comp. Stat. Ann. 5/5–4.5–60(e) (imposing criminal misdemeanor liability subject to a fine "not to exceed $1,500 for each offense"); Me.Rev.Stat. Ann. tit. 25, § 2468(8) (imposing fine of "not more than $500 for each violation"); N.J. Stat. Ann. § 52:27D–198.19(c) (imposing penalty of "not more than $1,000 for a first offense and not more than $2,500 for each subsequent offense"); Or.Rev.Stat. Ann. § 105.840 (owner may be liable for "the greater of actual damages or $250 per residential unit"); 35 Pa. Stat. and Const. Ann. § 7226 (imposing fine of "up to $50"); Tenn.Code Ann. § 68–120–112(a)(2), (e)(1) (amendment effective

our analysis because they relate to regulations regarding CO detectors, rather than to the replacement or maintenance of furnaces, which was the basis of liability here.[33] *Cf. CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.,* 499 F.3d 184, 189–90 (3d Cir.2007) (finding third guidepost "unhelpful" and "not instructive" for common-law claims and noting "our discussion is confined to the first two guideposts"). We turn next to comparable cases.

We have not located any decisions in Wyoming, or elsewhere throughout the Tenth Circuit, in which a large punitive damages award was entered in a personal injury action based on CO poisoning.[34] But other state courts confronting similar cases have imposed much smaller punitive damages awards than the $22,500,000 awarded against AMC here. For example, in *Sears, Roebuck & Co. v. Harris,* 630 So.2d 1018, 1034–35 (Ala.1993), the punitive damages award of $2,500,000 was one-tenth the size of the award here, despite the fact that one child was killed and three other people were injured by exposure to carbon monoxide.[35] *See also Killough v.*

---

33. January 1, 2016 adding carbon monoxide detectors to this provision's treatment of smoke detectors and making a violation a Class C misdemeanor); *id.* § 40-35-111(e)(3) (Class C misdemeanor punishable by imprisonment of "not greater than thirty (30) days or a fine not to exceed fifty dollars ($50.00), or both"); W. Va.Code Ann. § 29-3-16a(f), (k) (imposing criminal misdemeanor and a fine of $250 for first offense, $750 for second offense, and $2000 for third and subsequent offenses). *But see* Col.Rev.Stat. Ann. §§ 38-45-103, 104 (requiring landlord to provide and maintain carbon monoxide detectors but not including any specified fine or damages); Utah Code Ann. § 10-8-53.5 (providing that any local carbon monoxide detector requirements applicable to residential units may be enforced only against the occupant/tenant, subject to exceptions for carbon monoxide detectors in new home construction).

33. Moreover, the Supreme Court has instructed that under this *Gore* guidepost, we examine the "disparity between the punitive damages award and the '*civil penalties* authorized or imposed in comparable cases.'" *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 428, 123 S.Ct. 1513 (2003) (emphasis added) (quoting *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 575, 116 S.Ct. 1589 (1996)). Indeed, the Supreme Court has cautioned against the reliance on criminal penalties to support an award of punitive damages:

> Great care must be taken to avoid use of the civil process to assess criminal penalties that can be imposed only after the heightened protections of a criminal trial have been observed, including, of course, its higher standards of proof. Punitive damages are not a substitute for the criminal process, and the remote possibility of a criminal sanction does not automatically sustain a punitive damages award.

*Id.*

34. Ms. Lompe refers us to *Williams v. Vail Resorts Dev. Co.,* No. 2:02-cv-00016 (D.Wyo. Dec. 16, 2003), in which a jury awarded approximately $17.5 million in *compensatory* damages for personal injury and wrongful death resulting from CO poisoning. But that jury found plaintiffs had failed to show willful and wanton misconduct and therefore denied punitive damages.

35. Even combining the $4,000,000 the *Sears* jury awarded for wrongful death, which Alabama uniquely considers punitive rather than compensatory damages, with the $2,500,000 in punitive damages awarded to the survivors collectively, the total is only one-third of the $22,500,000 awarded to Ms. Lompe here under far less egregious circumstances than in *Sears. See McKowan v. Bentley,* 773 So.2d 990, 1000 (Ala.1999) (Houston, J., concurring) (conceding Alabama legislature, through its tort reform actions, "appears to have put its imprimatur" on long-standing Alabama Supreme Court interpretation that wrongful death statute only permits recovery of punitive damages); *see also* Susan Randall, *Only in Alabama: A Modest Tort Agenda,* 60 Ala. L.Rev. 977, 981–986 (2009) (explaining the history, extending to 1877, of the Alabama Supreme Court's interpretation of the wrongful death statute). But despite this disparity in the total amount of the awards, the dissent contends the *ratio* of punitive damages to

*Jahandarfard,* 578 So.2d 1041, 1046–47 (Ala.1991) (affirming a $2.5 million punitive damages verdict against a landlord where a child died of CO inhalation during a fire); *Kilmer v. Browning,* 806 S.W.2d 75, 78, 80 (Mo.Ct.App.1991) (affirming $300,000 in damages for wrongful death caused by CO exposure).

Thus, although our analysis of the third guidepost has not produced particularly robust comparisons, on the whole it reinforces our assessment that the $22,500,000 punitive damages award here was excessive because AMC was not on fair notice that it could be held to an award of $22,500,000 as a civil fine in the form of punitive damages.

In summary, we hold that the punitive damages award against AMC is unconstitutionally excessive. We reach this conclusion after exacting de novo review of the degree of AMC's reprehensibility, a comparison of the amount of general damages to the amount of punitive damages, and the review of the civil penalties awarded in comparable cases. Our next task, therefore, is to determine the proper punitive damages award in this case.

*d. The amount of punitive damages appropriate here.*

▪ Because we have concluded that the amount of the compensatory damages awarded to Ms. Lompe is substantial, an award of punitive damages equal to the compensatory award—$1,950,000—may represent the outermost limit of the due process guarantee. Indeed, since the Supreme Court's decision in *State Farm,* many federal appellate courts have imposed a 1:1 ratio where, as here, the compensatory damages exceed $1 million. *See, e.g., Morgan v. New York Life Ins. Co.,* 559 F.3d 425, 443 (6th Cir.2009) (vacating excessive punitive damages award in age discrimination case where the compensatory award was $6 million and remanding with instructions for district court to enter an amount of punitive damages not to exceed a 1:1 ratio); *Boerner v. Brown & Williamson Tobacco Co.,* 394 F.3d 594, 603 (8th Cir.2005) (reducing punitive damages award to "a ratio of approximately 1:1" where compensatory award was over $4 million and there was no evidence that the defendant intended to victimize the deceased).[36]

When courts have deviated upwards from a 1:1 ratio, the defendant has either intended to cause the substantial compensatory damages or engaged in particularly egregious behavior. *See, e.g., Turley v. ISG Lackawanna, Inc.,* 774 F.3d 140, 146, 167 (2d Cir.2014) (holding that a remittitur to an approximate 2:1 ratio would be constitutional where defendants subjected the plaintiff to "an extraordinary and steadily intensifying drumbeat of racial insults, in-

---

compensatory damages is much greater in *Sears* than a ratio of 1:1. This observation does not undermine our analysis under the third *Gore* guidepost because the Supreme Court does not instruct us to compare ratios at this point in the analysis, but rather "civil penalties authorized or imposed in comparable cases." *See State Farm,* 538 U.S. at 428, 123 S.Ct. 1513 (quoting *Gore,* 517 U.S. at 575, 116 S.Ct. 1589). The inquiry here is whether the imposition of civil fines against defendants in comparable cases put AMC on notice that it could be liable for the civil penalty imposed through the punitive damages award. And *Sears* was decided before the

Supreme Court explained the significance of the ratio between punitive damages and compensatory damages in *Gore.*

**36.** Other federal circuits have reached similar results in decisions that are unpublished. *See, e.g., Dawe v. Corr., USA,* 506 Fed.Appx. 657, 660 (9th Cir.2013) (unpublished) (affirming district court's reduction of punitive damages award to a 1:1 ratio where the compensatory award was over $2.5 million); *Jurinko v. Med. Protective Co.,* 305 Fed.Appx. 13, 28, 30 (3d Cir.2008) (unpublished) (reducing punitive damages award to a 1:1 ratio where compensatory award was over $1.6 million).

timidation, and degradation over a period of more than three years"); *Lee ex rel. Lee v. Borders*, 764 F.3d 966, 976 (8th Cir.2014) (upholding a 3:1 ratio between punitive and compensatory damages where employee at facility for individuals with developmental disabilities intentionally harmed patient at facility by raping her, thereby abusing a position of trust); *Ondrisek*, 698 F.3d at 1029–31 (reducing a 10:1 ratio to 4:1 in a case involving "extreme reprehensibility," where the defendant cult leader repeatedly and brutally battered minors, despite having been previously found liable of beating children under similar circumstances); *Gibson v. Moskowitz*, 523 F.3d 657, 664–65 (6th Cir.2008) (upholding a 2:1 ratio where mentally ill inmate died of dehydration after defendant doctor prescribed medication he knew caused "thermoregulation problems," left the inmate confined over the weekend in an observation room that eventually reached 96 degrees, and ignored nurse's warnings that the inmate was dangerously dehydrated).

In *Jones*, this court reduced the punitive damages to an amount equal to compensatory damages after considering the *Gore* factors as applied to the unique facts of that case. *See Jones*, 674 F.3d at 1208. There, the plaintiff brought a retaliatory discharge claim against the United Parcel Service (UPS), and the jury awarded the plaintiff $630,307 in compensatory damages and $2 million in punitive damages. On appeal, the *Jones* panel held the punitive damages award violated due process, despite the fact that the defendant's "conduct was both wilful and improper." *Id.* at 1207. In reaching that conclusion, the court was "persuaded primarily by the fact that [defendant's] conduct resulted solely in economic injury to Jones and that [defendant] did not act with disregard for the health and safety of others." *Id.* The panel also determined that the compensatory damages award was substantial in light of the plaintiff's injuries. *Id.* at 1208. Finally, the *Jones* panel reviewed comparable cases reducing punitive damages as excessive where the compensatory award was substantial. *Id.* We ultimately held in *Jones* that "a punitive damage award equal to the compensatory damage award is the maximum constitutionally allowable award under these particular facts." *Id.*

Here, application of the *Gore* factors also calls for a 1:1 ratio of punitive damages to compensatory damages. To begin, we consider the first and most significant *Gore* factor—reprehensibility. *State Farm*, 538 U.S. at 419, 123 S.Ct. 1513 ("The most important indicium of the reasonableness of a punitive damage award is the degree of reprehensibility of the defendant's conduct." (alteration and internal quotation marks omitted)). As previously discussed, AMC's conduct caused Ms. Lompe physical harm and resulted from AMC's "indifference to or ... reckless disregard of the health or safety of others," which it exhibited on several occasions. *Id.* But although we have concluded the evidence is sufficient to support the jury's finding that AMC's inaction was willful and wanton, thereby supporting an award of punitive damages, this finding by the jury required only that AMC's inattention or inadvertence fall just above gross negligence in its indifference or reckless disregard for the safety of AMC's tenants.[37] There was no evidence that AMC intended to cause harm to Ms. Lompe or to any other person, or that its conduct was "the result of intentional malice, trickery, or

---

**37.** The Wyoming Supreme Court has held that "[p]unitive damages are not appropriate in circumstances involving inattention, inadvertence, thoughtlessness, mistake, or even gross negligence." *Weaver v. Mitchell*, 715 P.2d 1361, 1370 (Wyo.1986) (citing *Danculovich v. Brown*, 593 P.2d 187, 191 (Wyo.1979)).

deceit." *Id.* And the Supreme Court has instructed that the risk of harm to nonparties is relevant to reprehensibility but cannot be used as a basis to punish the defendant. *See Philip Morris,* 549 U.S. at 354, 127 S.Ct. 1057 ("[T]o permit punishment for injuring a nonparty victim would add a near standardless dimension to the punitive damages equation.").

Next, the jury awarded Ms. Lompe substantial compensatory damages that include almost $1 million for her emotional distress. *See State Farm,* 538 U.S. at 426, 123 S.Ct. 1513 (stating that compensatory damages which included amounts for emotional distress "likely were based on a component which was duplicated in the punitive award"). Finally, our review of "civil penalties authorized or imposed in comparable cases," *id.* at 428, 123 S.Ct. 1513 (quoting *Gore,* 517 U.S. at 575, 116 S.Ct. 1589), reinforces our conclusion that a 1:1 ratio under the facts of this case

represents the appropriate limit of due process.

A ratio of 1:1 under the present facts ensures that the punishment imposed on AMC is "reasonable and proportionate" to the harm Ms. Lompe suffered, in light of the general damages she recovered. *Id.* at 426, 123 S.Ct. 1513. And a higher amount of punitive damages, under the circumstances of this case, would be "greater than reasonably necessary to punish and deter." *Haslip,* 499 U.S. at 22, 111 S.Ct. 1032. Because a 1:1 ratio of punitive damages to compensatory damages here satisfies "the State's legitimate objectives" of punishing and deterring future misconduct, we may go "no further." *State Farm,* 538 U.S. at 419–20, 123 S.Ct. 1513.[38] Accordingly, we reduce the award of punitive damages against AMC from $22,500,000 to $1,950,000, reflecting a reduction from a ratio of 11.5:1 to a 1:1 ratio of punitive damages to AMC's $1,950,000 share of the compensatory damages award (65% of $3,000,000).[39]

**38.** After reviewing the nineteen cases cited by the dissent in its Appendix, we remain unpersuaded that a ratio exceeding 1:1 is appropriate on the record before us in this case. Six of the dissent's cases ordered a remittitur to (or affirmed) either a 1:1 ratio or a ratio lower than 2:1 and accordingly reinforce our application of a 1:1 ratio here. *See Jones v. United Parcel Serv., Inc.,* 674 F.3d 1187 (10th Cir.2012); *Morgan v. New York Life Ins. Co.,* 559 F.3d 425 (6th Cir.2009); *Bach v. First Union Nat'l Bank,* 486 F.3d 150 (6th Cir. 2007); *Boerner v. Brown & Williamson Tobacco Co.,* 394 F.3d 594 (8th Cir.2005); *Pollard v. E.I. DuPont De Nemours, Inc.,* 412 F.3d 657 (6th Cir.2005); *Williams v. ConAgra Poultry Co.,* 378 F.3d 790 (8th Cir.2004). Among the cases that apply a ratio appreciably greater than 1:1, many do not even consider, let alone apply, *State Farm's* instruction that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." 538 U.S. at 425, 123 S.Ct. 1513. *See Brand Mktg. Grp. LLC v. Intertek Testing Servs., N.A.,* 801 F.3d 347 (3d Cir.2015); *Gibson v. Moskowitz,* 523

F.3d 657 (6th Cir.2008); *Hangarter v. Provident Life & Accident Ins. Co.,* 373 F.3d 998 (9th Cir.2004); *Zhang v. Am. Gem Seafoods, Inc.,* 339 F.3d 1020 (9th Cir.2003). Other cases involved intentionally culpable behavior by the defendant or significantly greater actual damages to the plaintiff and/or others. *See Lee ex rel. Lee v. Borders,* 764 F.3d 966 (8th Cir.2014); *Turley v. ISG Lackawanna, Inc.,* 774 F.3d 140 (2d Cir.2014); *Ondrisek v. Hoffman,* 698 F.3d 1020 (8th Cir.2012); *Gibson,* 523 F.3d at 661; *Action Marine, Inc. v. Cont'l Carbon Inc.,* 481 F.3d 1302 (11th Cir.2007); *Stogsdill v. Healthmark Partners, LLC,* 377 F.3d 827 (8th Cir.2004). In addition, some of the above cases can further be distinguished because the actual damages comparator was significantly less than the comparator here.

**39.** Reversing punitive damages as to Sunridge and reducing AMC's punitive damages from an 11.5:1 ratio to a 1:1 ratio effectively moots AMC's arguments that the punitive damages award unconstitutionally punished nonparties and considered unrelated sources of income. Accordingly, we do not address those arguments.

## V. CONCLUSION

We REVERSE IN PART and AFFIRM IN PART the district court's denial of Defendants' post-trial motion for JMOL, new trial, or remittitur. We REVERSE the district court's denial of Defendants' motion for JMOL on the question of submitting punitive damages to the jury as to Sunridge but AFFIRM as to AMC. We AFFIRM the district court's denial of Defendants' motion as to the jury instructions because the district court adequately instructed the jury as to the standard for punitive damages under Wyoming law, and we hold that Defendants waived their common law excessiveness objection to the amount of the punitive damages award. Finally, we REVERSE the award of punitive damages against AMC in the amount of $22,500,000, an 11.5:1 ratio to AMC's share of the compensatory damages award, and reduce it to $1,950,000, reflecting a 1:1 ratio to compensatory damages to comport with constitutional due process under the Fourteenth Amendment.

BACHARACH, Circuit Judge, concurring in part and dissenting in part.

I agree with much of the majority's well-reasoned opinion, but I respectfully disagree with the conclusions in Parts IV(A)(1)(a) and IV(D), which address (1) the sufficiency of the evidence for an award of punitive damages against Sunridge and (2) the constitutionality of the punitive damages assessed against Apartment Management Consultants (AMC). In my view, the evidence was sufficient for the jury to assess punitive damages against Sunridge. As to AMC, I agree with the majority that the punitive-damages award was so large that it resulted in a denial of due process. But I believe the majority reduces the punitive-damages award too far below the constitutional limit. Rather than order a remittitur of $1.95 million, I would reduce the amount of punitive damages to be assessed against AMC to $7.8 million, four times the amount of compensatory damages.

## I. The jury had sufficient evidence to assess punitive damages against Sunridge.

In considering the sufficiency of the evidence, we engage in de novo review. *Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 519, 529 (10th Cir.2000). For this review, we consider the evidence and reasonable inferences in the light most favorable to the plaintiff, Ms. Lompe. *See Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1298 (10th Cir.1998).

Viewing the evidence in this light, we must determine if a rational jury could regard Sunridge's misconduct as willful and wanton. *Weaver v. Mitchell*, 715 P.2d 1361, 1370 (Wyo.1986). Sunridge's misconduct would be "willful and wanton" if Sunridge intentionally failed to replace the furnaces "in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know, or have reason to know that such conduct would, in a high degree of probability, result in harm to another." *Id.*

The evidence of Sunridge's willful and wanton misconduct included

1. Sunridge's receipt of an inspection report upon purchasing the apartment complex, which recommended that Sunridge replace the furnaces,

2. Sunridge's repeated failures to act on contractors' bids to replace the furnaces,

3. Sunridge's inaction in the face of reports of other incidents involving carbon monoxide leaks, and

4. extraordinary health risks from Sunridge's failure to replace the furnaces.

Together, these four forms of evidence would have allowed the trier of fact to find willful and wanton misconduct on the part of Sunridge.

Before buying the apartment complex, Sunridge obtained a property assessment from LandAmerica Assessment Corporation. LandAmerica informed Sunridge that most of the furnaces appeared to be the complex's original units and were in fair condition. Appellants' App'x at 1980. According to LandAmerica, the furnaces had an expected life of 25 years and were already roughly 28 years old. *Id.* at 1989; *see also id.* at 709–10 (expert testimony that "[t]he generally accepted useful life for a furnace within the industry is 20 years"). As a result, LandAmerica recommended that Sunridge set aside $76,800 in capital reserves to replace the furnaces within five years. *Id.* at 1989; *see also id.* at 709, 714 (expert testimony about the LandAmerica report).

Yet three years after buying the complex, Sunridge had not authorized replacement of any furnaces. Thus, the jury could reasonably infer that when Ms. Lompe's furnace leaked, it was already about six years past its expected life. Because all of the furnaces were overdue for replacement, the jury could also reasonably infer that Sunridge had known that the risk of a carbon monoxide leak increased with each passing year.[1]

Ms. Lompe also presented evidence that Sunridge had obtained contractors' bids in 2007 or 2008 to replace all of the furnaces. *Id.* at 640. But Sunridge did not act on the bids, conduct preventative maintenance on the furnaces, or otherwise attempt to make the furnaces safe. *Id.* at 640, 1213.

Along with this evidence of inaction, Ms. Lompe presented testimony that Sunridge had known about prior furnace malfunctions. For example, a furnace leaked carbon monoxide in the apartment of the complex's manager. Ms. Lompe argued that Sunridge had been aware of this leak, presenting testimony that "[d]epending on the situation," an incident report would have been sent to Sunridge. *Id.* at 1546. In addition, one of Sunridge's two owners acknowledged that he would have expected to be told if a tenant evacuated because of a carbon monoxide leak. *Id.* at 1549, 1577–78.

The majority notes that there was no direct evidence of Sunridge's knowledge. Maj. Op. at 1048. But direct evidence was unnecessary because the jury could reasonably rely on two types of indirect evidence demonstrating that Sunridge had failed to act after learning of furnace leaks.

First, the jury could rely on the property manager's routine practice of forwarding inspection reports to Sunridge. *See* Fed.R.Evid. 406 (stating that evidence of an organization's routine practice can be admitted to prove that the organization acted in accordance with that routine practice on a particular occasion). This type of evidence does not require corroboration or testimony that the property manager carried out the routine practice on a particular occasion. *Id.; see also Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1261–62 (10th Cir.2012) (stating that courts may accept "Rule 406 evidence" for an "inference that a routine practice was actually carried out").

Second, AMC's regional property manager testified that Sunridge had received information about the furnace leak in Ms. Lompe's apartment. Appellants' App'x at 1546. Nonetheless, according to the regional property manager, Sunridge failed to do anything to replace the furnaces even after learning of the leak in Ms.

1. In holding that the evidence was sufficient for the jury to assess punitive damages against AMC, the majority relies in part on AMC's knowledge that the furnaces were nearly 30 years old and that each furnace had a useful life of only about 20 years. Maj. Op. at 1057. But this rationale applies to Sunridge as well as AMC. Like AMC, Sunridge was alerted to the use of furnaces past their useful lives.

Lompe's furnace. *Id.* at 1932. Based on this testimony, the jury could reasonably infer that Sunridge had failed to take action even after learning of a furnace leak that injured a tenant.

If the jury had drawn this inference, as permitted, the jury could have reasonably found Sunridge's inaction to be willful and wanton in light of the gravity of the risk. Carbon monoxide can be deadly. *See Id.* at 1531 (AMC's regional property manager acknowledging this risk); *see also Hanlon v. Lane*, 98 Ohio App.3d 148, 648 N.E.2d 26, 30 (1994) (holding that "the danger of carbon monoxide poisoning from the use of an improperly vented gas furnace is an open and obvious danger as a matter of law"). Thus, as the majority notes, the leakage of carbon monoxide risked death for every tenant in the complex. Maj. Op. at 1066.

The jury could rationally have found that Sunridge's inaction was not willful or wanton. But the jury could also rationally credit Ms. Lompe's version of events and infer that Sunridge

- had known when buying the apartment complex that the furnaces had been operating for so long that they were dangerous to apartment residents,
- had been reminded of the need to replace the furnaces when one of them leaked carbon monoxide in the manager's apartment, and
- had failed to take corrective action even after learning of multiple furnace leaks.

With these inferences from the evidence, the jury could reasonably have found that Sunridge's misconduct was willful and wanton. Accordingly, I respectfully dissent from the majority's contrary conclusion in Part IV(A)(1)(a).[2]

## II. The majority's constitutional cap on punitive damages to be assessed against AMC is too low.

The majority concludes that the assessment of $22.5 million in punitive damages against AMC constitutes a deprivation of substantive due process. I agree that this assessment was so large that it denied AMC due process and that the district court applied the incorrect standard when reviewing the jury's assessment. But I believe that the majority overcorrected the assessment given the factual findings made by the district court and the jury.

The jury found that AMC's conduct had constituted "willful and wanton misconduct," a finding the majority upholds. And in upholding this finding, the majority acknowledges that AMC intentionally failed to inspect the furnaces, recklessly risking the life of every tenant in the complex. But then the majority engages in its own fact finding, downplaying AMC's culpability based on the majority's own weighing of the evidence.

Instead, I would use the district court's and jury's fact findings to determine the constitutional limit for assessing punitive damages against AMC. In my view, the district court's and jury's findings would allow an assessment of punitive damages up to $7.8 million, four times the compensatory-damages award of $1.95 million.

### A. I would apply the district court's and the jury's factual findings to evaluate the constitutionality of the punitive damages assessed against AMC.

As the majority explains, the Supreme Court has established three "guideposts" bearing on our constitutional inquiry:

---

2. Sunridge also argued that the assessment of punitive damages was excessive. The majority does not reach this argument with respect to Sunridge; as a result, I also decline to address this argument.

1. the degree of reprehensibility of the defendant's misconduct,
2. the disparity between the actual or potential harm suffered by the plaintiff and the punitive-damages award, and
3. the difference between the punitive damages assessed by the jury and civil penalties authorized or imposed in comparable cases.

Maj. Op. at 1063 (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418, 123 S.Ct. 1513 (2003)); *see also BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574–75, 116 S.Ct. 1589 (1996) (setting out these guideposts). Like the majority, I would apply these three guideposts to determine the constitutionality of the punitive damages assessed against AMC. Unlike the majority, however, I would apply these three guideposts based on the factual findings made by the district court and the jury.

The majority is correct in stating that we apply de novo review to the ultimate issue: whether the amount of the punitive damages is so large that it violates AMC's right to substantive due process. Maj. Op. at 1061–62. But the three-part test is laden with factual issues, such as what the defendant did to merit punitive damages and the extent of the plaintiff's injury. Under Supreme Court precedent, we can disturb the resolution of these factual issues only if the district court's factual findings are clearly erroneous.

In applying more intensive scrutiny to these factual matters, the majority relies on *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 121 S.Ct. 1678 (2001). Maj. Op. at 1061–62, 1067 n. 21. But there, the Supreme Court distinguished between review of the ultimate constitutional issue (where de novo review is required) and the underlying factual matters bearing on the constitutional issue (where clear error review is required):

"While we have determined that the Court of Appeals must review the District Court's application of the *Gore* test de novo, it of course remains true that the Court of Appeals should defer to the District Court's findings of fact unless they are clearly erroneous." *Cooper Indus.*, 532 U.S. at 440 n. 14, 121 S.Ct. 1678. The Supreme Court cautioned that even though the ultimate constitutional issue requires de novo review, that does not mean that the jury's findings are also subject to de novo review. *Id.* To the contrary, the Court noted that its requirement of de novo review on the ultimate constitutional issue does not permit a reviewing court to disregard the jury's factual findings. *See id.* at 439 n. 12, 121 S.Ct. 1678 ("[N]othing in our decision today suggests that the Seventh Amendment would permit a court, in reviewing a punitive damages award, to disregard such jury findings.").

In light of the Supreme Court's observations, I would give due regard to the factual findings expressly made by the district court and the factual findings implicitly made by the jury. *See Rhone–Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 272 F.3d 1335, 1347 (Fed.Cir.2001) (interpreting the quoted language in *Cooper Industries* "to mean that if a punitive damages determination rests on purely factual issues, we are to assume that those factual issues have been resolved adversely to the defendant, absent contrary indication"), *vacated sub nom. DeKalb Genetics Corp. v. Bayer CropScience, S.A.*, 538 U.S. 974, 123 S.Ct. 1828, 155 L.Ed.2d 662, *reinstated sub nom. Rhone–Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 345 F.3d 1366 (Fed.Cir.2003); *Leatherman Tool Grp., Inc. v. Cooper Indus., Inc.*, 285 F.3d 1146, 1150 (9th Cir.2002) (stating, after the Supreme Court's remand, that "despite [the Supreme Court's] holding that we must review the district court's application of the *Gore* test de novo, we still must 'defer

to the district court's findings of fact unless they are clearly erroneous'" (quoting *Cooper Indus., Inc.*, 532 U.S. at 440 n. 14, 121 S.Ct. 1678)).

### B. The majority's constitutional analysis does not reflect the factual findings made by the district court and jury on matters affecting the reprehensibility of AMC's conduct.

In light of the factual findings by the district court and the jury, I respectfully disagree with the way that the majority assesses reprehensibility. In my view, the majority should have deferred to all of the district court's findings and assumed that the jury had resolved evidentiary conflicts against AMC; instead, the majority makes new factual findings, seeing mitigating evidence where the jury presumably did not. I do not believe that this independent fact finding was what the Supreme Court had in mind in *Cooper Industries.*

### 1. Reprehensibility is the most important of the three guideposts, triggering a need to defer to the district court's and jury's factual findings.

Of the three guideposts, reprehensibility is the most important. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419, 123 S.Ct. 1513 (2003). Under this guidepost, the factual findings by the district court and the jury take on special importance. *See Haynes v. Stephenson*, 588 F.3d 1152, 1157 (8th Cir.2009) (distinguishing the legal conclusion of reprehensibility from the findings of fact required to identify conduct that demonstrates reprehensibility); *Clark v. Chrysler Corp.*, 436 F.3d 594, 601 n. 7 (6th Cir.2006) (explaining an appellate court's deference to the district court's factual findings regarding the reprehensibility guidepost); *Leatherman Tool Grp., Inc. v. Cooper Indus.,*

*Inc.*, 285 F.3d 1146, 1150 (9th Cir.2002) (observing that in "determining the 'degree of reprehensibility,'" the reviewing court "must accept the underlying facts as found by the jury and the district court").

### 2. The reprehensibility of a party's conduct involves a continuum of blameworthiness.

The term "reprehensibility" can refer to varying degrees of culpability. Properly understood, the level of reprehensibility involves a continuum rather than a precise point. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (observing that "some wrongs are more blameworthy than others"); *see also Mendez v. Cty. of San Bernardino*, 540 F.3d 1109, 1120 (9th Cir. 2008) ("Reprehensibility falls along a scale."), *overruled on other grounds by Arizona v. ASARCO LLC*, 773 F.3d 1050 (9th Cir.2014); *Asa–Brandt, Inc. v. ADM Inv'r Servs., Inc.*, 344 F.3d 738, 748 (8th Cir.2003) (explaining that *Gore* established a "hierarchy of reprehensibility" for evaluating the constitutionality of a punitive-damages award); Laura J. Hines & N. William Hines, *Constitutional Constraints on Punitive Damages: Clarity, Consistency, & the Outlier Dilemma*, 66 Hastings L.J. 1257, 1303 (2015) ("Today, courts routinely rank the degree of the defendant's reprehensibility on a wide spectrum that runs from very little reprehensibility, through modest or intermediate reprehensibility, and up to substantial or extreme reprehensibility." (footnotes omitted)). For example, it may be reprehensible to steal from someone. But it is even more reprehensible to kill the victim afterward.

We must decide where AMC's conduct fell along the continuum of reprehensibility, ranging from a mere accident to intentional ill will. *Gore*, 517 U.S. at 575–76, 116 S.Ct. 1589. But we are confined to a

cold record because we were not at the trial, as the district court and jury were. Thus, the district court had "a somewhat superior vantage" point to assess reprehensibility. *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.,* 532 U.S. 424, 440, 121 S.Ct. 1678 (2001).

The majority acknowledges that the district court's and jury's findings are subject to clear-error review. But without finding clear error, the majority downplays certain findings and supplements them based on the majority's own assessment of mitigating evidence.

3. **The jury found that AMC had acted with willful and wanton misconduct, satisfying the high threshold of culpability required by Wyoming law for any award of punitive damages.**

The jury was asked to decide whether AMC's conduct satisfied Wyoming law's threshold for punitive damages. As the majority notes, that threshold requires a rigorous showing that the defendant's conduct was especially blameworthy: punitive damages can be assessed only if the defendant's conduct is "outrageous" because it is intentional, malicious, or involves willful and wanton misconduct. Maj. Op. at 1047–48. The majority further explains that Wyoming considers conduct "willful and wanton" only if it "approaches intent to do harm." *Id.* (quoting *Cramer v. Powder River Coal, LLC,* 204 P.3d 974, 979 (Wyo.2009)). Thus, the district court instructed the jury that it could assess punitive damages only if AMC had intentionally acted or declined to act "in reckless disregard of the consequences, and under such circumstances and conditions that a reasonable person would know, or have reason to know, that such conduct would, with a high degree of probability, result in harm to another." Appellants' App'x at 128. The jury specifically found that AMC's misconduct satisfied this rigorous

threshold of blameworthiness, and the majority concludes that this finding was sufficiently supported by the evidence. *Id.* at 158; Maj. Op. at 1057.

Because I agree that this finding is supported by the evidence, I would consider AMC's misconduct as "willful and wanton" when assessing the reprehensibility guidepost. *See Cabral v. U.S. Dep't of Justice,* 587 F.3d 13, 26 (1st Cir.2009) (noting that the jury's finding supported the reprehensibility guidepost).

The majority points out that the amount of punitive damages that the jury chose to award is not a factual finding. Maj. Op. at 1061–62, 1063–64; *see also Cooper Indus.,* 532 U.S. at 437, 121 S.Ct. 1678 ("[T]he level of punitive damages is not really a 'fact' 'tried' by the jury." (quoting *Gasperini v. Ctr. for Humanities, Inc.,* 518 U.S. 415, 459, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996) (Scalia, J., dissenting))). But the jury did make a factual finding when it determined that AMC's alleged misconduct was so blameworthy that it met Wyoming's high threshold for punitive damages. The majority concludes that this finding was supported by the record. Nevertheless, the majority then disregards this finding when evaluating the reprehensibility of AMC's conduct. *See* Maj. Op. at 1064 ("[T]he jury's verdict in the liability phase of trial does not inform our constitutional analysis.... [T]he jury here made no findings that are relevant to our application of the *Gore* factors.").

The majority seems to suggest that we cannot defer to a jury's findings in the absence of special interrogatories. *See id.* at 1063 (noting that the jury was not asked to answer special interrogatories). I respectfully disagree. In my view, we should assume that the jury resolved evidentiary conflicts adversely to AMC unless the record indicates otherwise. *See United States v. Dowell,* 430 F.3d 1100, 1110

(10th Cir.2005) (explaining that a jury's verdict "encompassed ... factual findings" embedded in the statutory provision that the jury applied); *Ag Servs. of Am., Inc. v. Nielsen*, 231 F.3d 726, 733 (10th Cir.2000) ("[W]e ... find necessary inferences from the verdict indicating that certain views of the evidence were *not* taken by the jury, as they could not have rationally supported the result." (emphasis in original)).

Because the jury found willful and wanton misconduct, the jury must have regarded AMC's misconduct as "something in the nature of special ill-will" that constituted "oppression, fraud or malice." *Farmers Ins. Exch. v. Shirley*, 958 P.2d 1040, 1051 (Wyo.1998) (quoting *McCullough v. Golden Rule Ins. Co.*, 789 P.2d 855, 861 (Wyo.1990)).

### 4. The district court's factual findings render AMC's conduct particularly reprehensible.

Even if we were to disregard the jury's implicit findings, we must still defer to the district court's factual findings. *See CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.*, 499 F.3d 184, 189 (3d Cir.2007). After hearing the evidence, the district court denied AMC's and Sunridge's renewed motion for judgment as a matter of law or, in the alternative, for new trial or remittitur. Appellants' App'x at 287–314. In doing so, the district court made four factual findings bearing on the reprehensibility of AMC's conduct:

1. The harm to Ms. Lompe was physical, not merely economic.[3]
2. "[I]f [Ms. Lompe] had been in her apartment even minutes longer, she likely would have lost consciousness and the carbon monoxide exposure

could have disabled her for the rest of her life or could have been fatal."
3. "The potential for similar injuries to others was great where the defendants failed to correct known problems with furnaces in the apartment complex, exposing other tenants to carbon monoxide poisoning as well."
4. "This was not an isolated incident."

*Id.* at 309, 313. Neither AMC nor the majority suggests that the district court clearly erred in making these factual findings.

These four findings reflect particularly reprehensible conduct by AMC. In *Bielicki v. Terminix International Co.*, we recognized that a defendant acts reprehensibly when operating in an "atmosphere of condoning the disregard of safety practices" that could result in physical injuries to others. 225 F.3d 1159, 1163, 1165 (10th Cir.2000); *see also Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*, 399 F.3d 224, 233 (3d Cir.2005) (concluding that "a mix of purposefully indifferent inaction and intentionally dilatory action" is reprehensible). The jury presumably found that AMC had disregarded safety practices, for even the majority acknowledges that AMC had recklessly failed to conduct regular furnace inspections, risking the life of every tenant in the apartment complex. Maj. Op. at 1066. Under *Bielicki*, AMC's reckless disregard for safety practices is particularly reprehensible.

### 5. The majority improperly relies on mitigating evidence to find that AMC's conduct was not particularly reprehensible.

The majority downplays AMC's culpability based on evidence that the majority

---

3. The majority seems to conclude that this finding is mitigated by the fact that the compensatory-damages award included "both physical harm and economic loss." Maj. Op. at 1066. But AMC concedes that the harm

was physical and does not argue that the inclusion of economic damages is a mitigating factor. *See* Appellants' Opening Br. at 46 ("The harm here was physical, as opposed to economic.").

sees as mitigating. In my view, this approach elevates our fact-finding role over the jury's, effectively undermining the jury's role in resolving evidentiary conflicts.

Though we exercise de novo review on the ultimate question of constitutionality, we are not fact finders. Nonetheless, the majority independently evaluates the evidence, finding in the first instance that AMC's conduct was not "particularly reprehensible" based on what the majority regards as mitigating evidence:

- AMC was not cited by regulators for the prior incidents of poisoning,
- AMC voluntarily provided each tenant with a carbon monoxide detector, and
- AMC purportedly conformed to industry standards.

Maj. Op. at 1066–67. But faced with this same evidence, the jury regarded AMC's misconduct as willful and wanton. Appellants' App'x at 128, 153, 158. The district court then concluded that the jury must have "viewed the defendants' conduct as egregious." *Id.* at 314. In light of the jury's apparent conclusions from conflicting evidence, I believe that we should regard AMC's conduct as particularly reprehensible for purposes of the first guidepost.

In my view, even the majority's fresh look at the evidence would support a large assessment of punitive damages. For example, while regarding some of the evidence as mitigating, the majority concludes that Ms. Lompe's injury resulted from repeated actions or failures to act, rather than an isolated incident:

> [T]hree prior [carbon monoxide] leaks, including one in which [the apartment manager] was poisoned, put AMC on notice that the furnaces needed regular substantive safety inspections to prevent future dangerous releases of [carbon monoxide]. Failing to perform such inspections recklessly endangered not only

Ms. Lompe, but also all the tenants at the apartment complex, and the risk included death.

Maj. Op. at 1066.

Though the majority finds that AMC's "reckless[ ]" failure to conduct inspections endangered the lives of every tenant in the apartment complex, the majority concludes that AMC's conduct was not particularly reprehensible in part because it did not involve "intentional malice, trickery, or deceit." *Id.* at 1067 (quoting *Jones v. UPS, Inc.*, 674 F.3d 1187, 1207 (10th Cir.2012)). I respectfully think that this characterization understates the reprehensibility of AMC's conduct and displaces the jury's finding of willful and wanton misconduct.

In my view, AMC's conduct was worse than trickery or deceit—AMC recklessly risked the life of every tenant in the entire apartment complex. *See Mendez v. Cty. of San Bernardino*, 540 F.3d 1109, 1120 (9th Cir.2008) (stating that on a scale of reprehensibility, reckless disregard for others' health and safety is even more egregious than affirmative acts of trickery and deceit), *overruled on other grounds by Arizona v. ASARCO LLC*, 773 F.3d 1050, 1058 n. 1 (9th Cir.2014); *Action Marine, Inc. v. Cont'l Carbon Inc.*, 481 F.3d 1302, 1320 (11th Cir.2007) (noting that, though "punitive damages may not be awarded to punish for harm inflicted on nonparties, [the court] may consider the risk of harm to others as part of the reprehensibility analysis" and the fact that the defendant's conduct endangered "a great number of people" who were not parties to the litigation rendered the defendant's conduct "exceedingly reprehensible" (citing *Philip Morris U.S.A. v. Williams*, 549 U.S. 346, 127 S.Ct. 1057, 166 L.Ed.2d 940 (2007))); *see also* Blaine LeCesne, *Crude Decisions: Re–Examining Degrees of Negligence in the Context of the BP Oil Spill*, 2012 Mich.

St. L.Rev. 103, 126 ("It is this focus on the design or purpose in the actor's state of mind which places willful misconduct closer to the intentional conduct end of the spectrum, while gross negligence is nearer to the ordinary negligence end of that spectrum.").

The majority correctly states that willful and wanton misconduct is not as reprehensible as "intentional malice." Maj. Op. at 1067 (quoting *Jones v. UPS, Inc.,* 674 F.3d 1187, 1207 (10th Cir.2012)). But this is not saying much. The majority elsewhere holds that under Wyoming law, "[a] willful or wanton state of mind is one 'that approaches intent to do harm.'" *Id.* at 1055 (quoting *Cramer v. Powder River Coal, LLC,* 204 P.3d 974, 979 (Wyo.2009)). Applying this test, the majority concluded that the jury had sufficient evidence to find that AMC had a state of mind approaching an intent to do harm. *Id.* at 1057. I would regard that state of mind as particularly reprehensible even if it did not involve intentional malice.

But I respectfully disagree with more than the majority's placement of AMC's misconduct on the reprehensibility continuum. In my view, the majority should not find mitigation in the first instance when the jury considered the same evidence and regarded the misconduct as willful and wanton.

For example, the majority states that AMC was not cited by regulators for the prior leaks of carbon monoxide. *Id.* at 1066. But the apartment complex's sole maintenance employee from 2009 to 2012 testified that no one had ever inspected any of the furnaces in the complex. Appellants' App'x at 1214. Without evidence that an inspection took place, the absence of a regulatory citation is neither surprising nor meaningful.

Regardless of whether a formal citation was issued, the district court stated that after the apartment manager was poisoned, the local gas utility had told AMC that the furnaces should be inspected. *Id.* at 291; *see also id.* at 655, 761. AMC apparently ignored that recommendation. Even the majority acknowledges that AMC knew that its furnaces had outlived their expected duration and had leaked carbon monoxide on multiple occasions, endangering all the tenants. Maj. Op. at 1057. As a result, I question the majority's reliance on the absence of a citation by the gas utility.[4]

The majority also points to evidence that carbon monoxide detectors were provided to the tenants. *Id.* at 1066. But the evidence also showed that (1) after Ms. Lompe's furnace leaked carbon monoxide, approximately half of the apartments lacked a working carbon monoxide detector, (2) the tenants with carbon monoxide detectors were never told anything about the detectors, and (3) the distribution of carbon monoxide detectors was not a substitute for proper maintenance of the furnaces. Appellants' App'x at 657, 667-68, 674-76, 1127-28, 1204, 1220, 1231, 1256 (lack of working carbon monoxide detectors); *id.* at 1127-28, 1143, 1204 (tenants who had detectors were never told about

---

4. The majority notes that the absence of a citation from the gas utility is "not inconsistent" with its determination that AMC's failure to act constituted reckless disregard of consequences, which would result in harm to another. Maj. Op. at 1064-65 n. 18. I am not suggesting otherwise, for my point is different. The majority concludes that the jury could have found that AMC acted in reckless disregard for its tenants, and the district court found that the local gas utility had alerted AMC to the need to inspect its furnaces. Even if the gas utility did not cite AMC, AMC knew that the furnaces were dangerous. Thus, AMC acted with reckless disregard for its tenants' safety, which bears on the element of reprehensibility.

them); *id.* at 767–68 (detectors not substitutes for furnace maintenance).

AMC's own maintenance worker testified that he had expressed concern to AMC about the lack of carbon monoxide detectors in all of the units and the need for hardwired carbon monoxide detectors. *Id.* at 1256–57. AMC replied to this concern by saying that hardwired detectors were "[n]ot in the budget." *Id.* at 1257.

How are we to balance AMC's provision of carbon monoxide detectors against evidence of the detectors' ineffectiveness? And how does AMC's provision of the detectors factor into AMC's overarching misconduct? It is difficult, if not impossible, to resolve these questions on the basis of a cold record. Having heard all the evidence, mitigating and aggravating, the jury regarded AMC's misconduct as willful and wanton. I would not lightly disregard this assessment based on our own characterization of AMC's distribution of detectors as mitigating.

Finally, the majority says that there was some evidence that AMC "conformed to industry standards in dealing with the aging fleet of furnaces." Maj. Op. at 1066. But there was also evidence to the contrary. For example, an expert witness testified that AMC had violated the Wyoming fire safety code by failing to maintain a safe heating system. Appellants' App'x at 708. The expert witness also testified that the industry standard required inspections and maintenance of the furnaces. *Id.* at 703–04. And Ms. Lompe presented evidence that no one had ever inspected the furnaces. *Id.* at 1214. The jury evaluated this conflicting evidence and found that AMC had engaged in willful and wanton misconduct. To me, this finding requires us to consider AMC's misconduct as particularly reprehensible, for resolution of the evidentiary conflicts was for the jurors, not for us on the basis of a cold record.

## C. The majority puts undue weight on the fact that the jury awarded a substantial amount of compensatory damages.

We must also consider the ratio of punitive to compensatory damages. As the majority notes, the Supreme Court has provided only general guidelines for the constitutionally permissible ratio. Maj. Op. at 1067–68 & n. 24. For example, the Supreme Court stated that (1) a 4-to-1 damages ratio might be close to the constitutional boundary and (2) a ratio significantly exceeding single digits might cross the constitutional line. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425, 123 S.Ct. 1513 (2003); *see also Clark v. Chrysler Corp.*, 436 F.3d 594, 620 (6th Cir.2006) (Moore, J., concurring in part & dissenting in part) ("[T]he Court has never explicitly said that a 4:1 ratio actually *is* close to the constitutional line, just that it *might be*." (emphasis in original)); *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 676 (7th Cir.2003) ("The Supreme Court did not ... lay down a 4-to-1 or single-digit-ratio rule—it said merely that 'there is a presumption against an award that has a 145-to-1 ratio.'" (quoting *State Farm*, 538 U.S. at 425, 123 S.Ct. 1513)). The Supreme Court added that even a 1-to-1 ratio might represent the constitutional limit when the award of compensatory damages is substantial. *State Farm*, 538 U.S. at 425, 123 S.Ct. 1513.

Despite these conflicting and ambiguous signals from the Supreme Court, the majority finds a pattern among the circuit court cases. Some courts have held that when a defendant's conduct is not particularly reprehensible and the compensatory damages are substantial, a 1-to-1 ratio represents the constitutional boundary. *See* Maj. Op. at 1073–76 (citing cases). Other courts have held that even when the compensatory damages are substantial, the constitutionally permissible ratio can far

exceed 1-to-1. *See, e.g., Brand Mktg. Grp. LLC v. Intertek Testing Servs., N.A., Inc.,* 801 F.3d 347, 366 (3d Cir.2015) (concluding that "a 5:1 ratio is not the type of gross disparity between compensatory and punitive damages that renders a punitive award suspect by itself" for a compensatory-damages award of $1.045 million); *Gibson v. Moskowitz,* 523 F.3d 657, 665 (6th Cir.2008) ("[T]he 2 to 1 ratio ... falls well short of the high end of this range and indeed parallels the kind of relationship that the Court has said will often suffice [for a compensatory-damages award of $1.5 million]."); *Planned Parenthood of the Columbia/Willamette Inc. v. Am. Coal. of Life Activists,* 422 F.3d 949, 962 (9th Cir.2005) (stating that when the award of economic damages is significant, a 4–to–1 ratio is a "good proxy for the limits of constitutionality" if the "behavior is not particularly egregious"); *Diesel Mach., Inc. v. B.R. Lee Indus., Inc.,* 418 F.3d 820,

840 (8th Cir.2005) (rejecting an argument that "a four-to-one ratio is *per se* constitutional" when the plaintiff was awarded $665,000 in compensatory damages)[5]; *Hangarter v. Provident Life & Accident Ins. Co.,* 373 F.3d 998, 1015 (9th Cir.2004) (concluding that a 2.6–to–1 ratio is "well within the Supreme Court's suggested range for constitutional punitive damages awards" for a compensatory-damages award of $1.92 million); *see also* Laura J. Hines & N. William Hines, *Constitutional Constraints on Punitive Damages: Clarity, Consistency, & the Outlier Dilemma,* 66 Hastings L.J. 1257, 1302, 1314–15 (2015) (studying 507 published opinions and concluding that when courts characterize the compensatory awards as substantial, "the majority do not appear to feel particularly bound by a 1:1 ratio").[6]

How should we reconcile these conflicting signals from the Supreme Court and

**5.** The majority points to a 2012 opinion from the Eighth Circuit: *Ondrisek v. Hoffman,* 698 F.3d 1020 (8th Cir.2012). Maj. Op. at 1069–70. Citing *Ondrisek,* the majority states that the Eighth Circuit has reduced the award in three post-*Gore* cases when the compensatory damages were substantial. *Id.* (citing *Ondrisek,* 698 F.3d at 1029–30). But in *Ondrisek,* the Eighth Circuit held that the constitution would permit a 4–to–1 ratio, even though compensatory damages were $3 million (over 50 percent higher than the $1.95 million assessment of compensatory damages against AMC). *Ondrisek,* 698 F.3d at 1030–31. In doing so, the Eighth Circuit stated that its "constitutional boundary" was a 4.8–to–1 ratio "when multi-million dollar compensatory damages award[s] are involved." *Id.*

In my view, the Eighth Circuit's opinion in *Ondrisek* supports some reduction in Ms. Lompe's award of punitive damages, but not to a 1–to–1 ratio. My proposed ratio, 4–to–1 in this case, is below the Eighth Circuit's constitutional boundary of 4.8–to–1 in cases involving compensatory damages in the millions of dollars.

**6.** In an appendix, I have surveyed cases involving compensatory-damages awards of

$400,000 or more. The appendix shows that there is no discernible pattern in ratios approved in circuit courts, much less a trend toward awarding punitive damages in a 1–to–1 ratio when the compensatory damages are substantial.

The majority attempts to distinguish some of these cases in which a court approved of a ratio of damages exceeding 1–to–1, stating that the cases involved "intentionally culpable behavior ... or significantly greater actual damages to the plaintiff." Maj. Op. at 1075 n. 38. In my view, this distinction is immaterial for two reasons. First, as the majority states, each case is fact specific. *See id.* at 1069 n. 28 ("[T]he disparity in holdings indicates that the maximum of punitive damages that comports with due process is highly dependent upon the relevant facts."). The majority points to a number of cases that limit the ratio to 1–to–1. I am simply pointing to these cases to show that numerous courts have approved higher ratios even when the damages are substantial. Second, the majority's distinction assumes that AMC was not particularly culpable in this case. But as discussed above, the jury's verdict was tantamount to a finding that AMC's misconduct

the variety of approaches in other circuits? In my view, there is only one way: the ratios must be assessed on a case-by-case basis because the reprehensibility of the defendant's conduct and the size of a compensatory-damages award involve continuums rather than precise points. For example, an award of $300 million in compensatory damages would strike anyone as substantial. But so would an award of $3 million. Nonetheless, application of the same ratio would result in far different assessments of punitive damages. For example, a 4–to–1 ratio would result in

- a $1.2 billion assessment of punitive damages if the compensatory damages were $300 million, and
- "only" a $12 million assessment of punitive damages if the compensatory damages were $3 million.

Accordingly, the Supreme Court has declined to impose a bright-line ratio and has cautioned reviewing courts to assess the permissible ratio in light of the compensatory-damages award. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425–26, 123 S.Ct. 1513 (2003).

This caution reflects the Supreme Court's recognition that when the compensatory damages are extraordinarily large, any multiplier above 1 might render the punitive-damages award excessive. *Id.* at 425, 123 S.Ct. 1513. Consider the $300 million hypothetical above: even a 1–to–1 ratio would yield punitive damages of $300 million. Thus, any multiplier greater than 1 might be overly severe and violate the defendant's right to due process even if the defendant's conduct is particularly reprehensible.

Here, the compensatory damages were $1,950,000. Like the majority, I regard this amount as substantial. But the Supreme Court has not suggested a hard-and-fast rule limiting punitive damage awards to a 1–to–1 ratio whenever the compensatory damages are considered substantial.[7]

Against this backdrop, I would regard the substantiality of the award as a continuum, much like the continuum on reprehensibility. Just as the term "reprehensibility" describes various degrees of culpability, the term "substantial" describes many different dollar amounts. *Compare Clark v. Chrysler Corp.*, 436 F.3d 594, 607 (6th Cir.2006) (noting that a $236,000 compensatory-damages award was "not particularly large"), *and Flax v. DaimlerChrysler Corp.*, 272 S.W.3d 521, 539 (Tenn.2008) ("Although the United States Supreme Court has made no effort to demonstrate when damages are 'substantial,' we do not believe that an award of $2,500,000 is so large as to require a ratio of 1 to 1."), *with Bains LLC v. Arco Prods. Co.*, 405 F.3d 764, 776 (9th Cir. 2005) (stating that $50,000 in economic damages was "substantial").

Ms. Lompe's compensatory-damages award of $1,950,000 was large, and I would consider that fact along with the other two *State Farm* guideposts articulated in *Gore*. *Gore*, 517 U.S. at 575–76, 116 S.Ct. 1589 (identifying two other guideposts: reprehensibility and the "difference between

had "approached an intent to do harm." *See* p. 1084, above.

**7.** After the Supreme Court decided *Gore*, we held in *Continental Trend Resources, Inc. v. OXY USA Inc.* that even when the compensatory damages are more than $1 million, a roughly 6–to–1 ratio can be constitutionally permissible. 101 F.3d 634, 643 (10th Cir. 1996). *Continental Trend Resources* remains good law. The Supreme Court later decided

*State Farm* and noted that a 1–to–1 ratio may push the constitutional bounds when the compensatory damages are substantial. *See State Farm*, 538 U.S. at 425, 123 S.Ct. 1513. But the Court did not set this as a hard-and-fast rule or suggest that any substantial award of compensatory damages would obviate the need to consider the other guideposts, including the most important one, the reprehensibility of the defendant's conduct. *See generally State Farm*, 538 U.S. 408, 123 S.Ct. 1513.

this remedy and the civil penalties authorized or imposed in comparable cases"). The inquiry under *State Farm* does not end with characterization of the compensatory damages as "substantial." We must also consider the other two guideposts to determine whether the amount assessed in punitive damages is constitutionally permissible.

### D. The third factor, involving the disparity with penalties in comparable cases, is inapplicable here.

The third *State Farm* guidepost directs us to consider the disparity between the punitive-damages award in this case and civil penalties authorized or imposed in comparable cases. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418, 123 S.Ct. 1513 (2003). In my view, this guidepost does not help us evaluate the constitutionality of the punitive damages to be assessed against AMC. *See CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc.*, 499 F.3d 184, 189–90 (3d Cir. 2007) (limiting the constitutional analysis to the first two guideposts in the absence of relevant, comparable civil penalties).

The majority acknowledges that the penalties associated with "violations of common law tort duties often do not 'lend themselves to a comparison with statutory penalties.'" Maj. Op. at 1070 (quoting *Cont'l Trend Res., Inc. v. OXY USA Inc.*, 101 F.3d 634, 641 (10th Cir.1996)). Nonetheless, the majority concludes that this guidepost "reinforces" a substantial reduction in punitive damages because

- many other states lack civil penalties for failure to maintain heating equipment, and
- other state courts have imposed punitive damages much less than $22.5 million.

*Id.* at 1073.

For the sake of argument, we may assume that this guidepost supports a substantial reduction in the assessment of punitive damages. But I do not believe the majority's analysis requires us to remit the punitive damages to be assessed against AMC to $1.95 million.

The majority identifies several state statutes that require maintenance of heating systems, pointing out that they do not authorize civil penalties. *Id.* at 1071–72 & nn. 33–32. The majority views this factor as reinforcing its decision to cap the punitive damages to be assessed against AMC at $1.95 million. *Id.* at 1076. But, as the majority notes, no state authorizes civil penalties for failure to properly maintain furnaces. As a result, this factor is neutral; it does not reinforce anything.

In addition, the majority cites three cases in two states (Alabama and Missouri) between 1991 to 1993 for the proposition that courts "have generally awarded much smaller punitive damages than those awarded here." *Id.* at 1073–74 & n. 36. Again, I do not believe the cited cases help us to decide the amount of the remittitur. Each of these cases was decided before the Supreme Court decided *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589 (1996), which fundamentally changed the nature of our inquiry into the constitutionality of punitive damage assessments. The majority seems to acknowledge this fact, but still holds that these cases should have put AMC on notice of the potential degree of punitive damages. *See* Maj. Op. at 1072–73. I respectfully disagree.

First, in *Sears, Roebuck and Co. v. Harris*, the Alabama Supreme Court upheld a $2.5 million punitive-damages award after reducing the compensatory damages to $350,001, yielding a constitutionally permissible ratio of over 7.1 to 1—several degrees higher than my proposed 4-to-1 ratio and magnitudes above the majority's

1-to-1 ratio. 630 So.2d 1018, 1034-35 (Ala.1993).[8]

Second, in *Killough v. Jahandarfard,* the Alabama Supreme Court upheld an assessment of $2.5 million in punitive damages in a wrongful-death action because (1) the defendant had failed to equip the tenant's home with a smoke detector and (2) a fire resulted in a child's death from carbon monoxide poisoning. 578 So.2d 1041, 1042 (Ala.1991). But we do not know anything about the defendant's conduct in maintaining the house or when the fire took place. We know only when the suit was filed: over 27 years ago. *See id.* at 1042. Even then, the state supreme court upheld an assessment of $2.5 million in punitive damages.

For our inquiry on punitive damages, these cases tell us only that (1) more than 25 years ago, two Alabama juries awarded $2.5 million in punitive damages in cases involving carbon monoxide, and (2) in one of those cases, the ratio of punitive to compensatory damages was over 7.1-to-1. I do not think these Alabama cases could have put AMC on notice that any punitive-damages award would be limited to the extent of actual harm caused to its tenants (either to $1.95 million or any other amount).

In the third case that the majority cites, *Kilmer v. Browning,* a Missouri appellate court affirmed a $300,000 award based on "aggravating circumstances" that could be considered under a Missouri statute. 806 S.W.2d 75, 77, 80 (Mo.Ct.App.1991). But we do not know how much of this award was for compensatory damages versus punitive damages—we know only that "it was for the jury to determine if aggravating circumstances were present." *Id.*

In my view, we cannot determine the constitutional limit for punitive damages to be assessed against AMC based on

- three cases from Alabama and Missouri that were decided about 25 years ago and

- a number of state laws that lack any civil penalties.

\* \* \*

I respectfully disagree with the majority's adjusted assessment of punitive damages against AMC. The majority makes its own factual findings on AMC's reprehensibility without applying the clear-error standard to the district court's factual findings or considering the jury's finding of willful and wanton misconduct. These findings require us to consider AMC's conduct as particularly reprehensible—the most important of the three *State Farm* guideposts bearing on the constitutionality of the punitive-damages award.

I agree that the compensatory-damages award is substantial. But other courts have regularly permitted an assessment of punitive damages at a multiplier approximating four times the compensatory-damages award, even when the compensatory damages are substantial, as shown in the appendix.[9]

8. The majority points out that if we combine all of the punitive-damages awards in *Sears,* amounting to $6.5 million, it would be less than one-third of the punitive-damages award in this case. Maj. Op. at 1072-73 n. 35. But my proposed remittitur of $7.8 million is only 20% higher than the punitive damages assessed roughly 25 years ago in *Sears.*

9. In a far more exhaustive survey, covering 507 published cases, two scholars found that

when compensatory damages ranged from $5 million to $9.9 million, 39% of the cases permitted punitive damages in a ratio exceeding 4 to 1. Laura J. Hines & N. William Hines, *Constitutional Constraints on Punitive Damages: Clarity, Consistency, & the Outlier Dilemma,* 66 Hastings L.J. 1257, 1314-15 (2015).

As a result, I would order a remittitur, but not one as severe as the majority's. I would order a remittitur of $7.8 million (a 4–to–1 ratio) rather than $1.95 million (a 1–to–1 ratio).

## III. Conclusion

I respectfully dissent from two of the majority's conclusions:

1. that the evidence was insufficient for an award of punitive damages against Sunridge and

2. that for AMC, the Constitution requires a remittitur of $1.95 million in punitive damages.

Instead, I would uphold the punitive-damages award against Sunridge and order a remittitur on the punitive-damages award against AMC for $7.8 million.

## Appendix: Survey of Ratios of Punitive Damages to Compensatory Damages When the Compensatory Damages Are $400,000 or More

This appendix displays the results of a survey of punitive damage awards when the underlying award of compensatory damages was at least $400,000. In each of the surveyed cases, a federal court of appeals upheld the award of punitive damages, either as a constitutionally permissible award by the jury or as a constitutionally permissible amount through remittitur. Each point represents a single damages award. The bold line represents a 1–to–1 ratio of punitive damages to compensatory damages. Each case is labeled with a data point. The red triangle shows how my proposed ratio of 4 to 1 would fit within the survey of awards upheld against due process challenges when the compensatory damages awarded are $400,000 or more.